CITY OF DEARBORN v. ANSELL.

1. CONSTITUTIONAL LAW—MUNICIPAL ORDINANCES—FREEDOM OF
SPEECH—FREEDOM OF THE PRESS.
   Municipal ordinances adopted under State authority constitute
   State action and are within the prohibition of the fourteenth
   amendment of the Constitution of the United States insofar
   as they may infringe upon the freedom of speech or freedom
   of the press (U. S. Const. Ams. 1, 14).

2. SAME—ARBITRARY STANDARD—DISTRIBUTION OF HANDBILLS.
   City ordinance prohibiting distribution of circulars or handbills
   without a license and providing that no license should be
   issued for literature which contained "obscene, immoral, scan-
   dalous, libelous or treasonable statements or any statement
   the truth of which cannot be established to the satisfaction of
   the city clerk" held, void on its face as in derogation of the
   right of freedom of speech and freedom of the press, as guar-
   anteed by the Constitution (U. S. Const. Ams. 1, 14; Mich.
   Const. 1908, art. 2, § 4).

Appeal from Wayne; Callender (Sherman D.), J.
Submitted June 20, 1939. (Docket No. 47, Calendar
No. 40,087.) Decided September 6, 1939.

Alonzo Ansell was convicted of violating an ordi-
nance forbidding the distribution of circulars or
handbills. From denial of writ of certiorari in cir-
cuit court, defendant appeals. Reversed.

*James E. Greene,* Corporation Counsel, and *Frank
C. McCann,* Assistant Corporation Counsel, for
plaintiff.

*Maurice Sugar* (*Louis Rosenzweig* and *Samuel B.
Keene,* of counsel), for defendant.

McAllister, J.   Defendant was arrested in the city of Dearborn for distributing leaflets in violation of a city ordinance.   The leaflets read as follows:

Open Air Meeting
Thursday, May 14th, 7:30 p. m.
Omar and Salina
Subject: Stop Relief Cuts
Speaker: Kelly—Organizer of the
Workers Alliance

He was thereafter convicted in justice court of violating the ordinance which provides:

"No person, firm or corporation, shall circulate, distribute, give away or cause to be circulated, distributed or given away in or upon any public property or private property, including automobiles, in the city of Dearborn any circulars or handbills, except such as is expressly authorized by law or addressed by name and street number to the occupants of the premises or newspapers duly registered with the U. S. post office department as second class matter, without first having obtained a license therefor from the city of Dearborn   *   *   *   .

"No license shall be issued for the distribution of any circular, handbill, advertising matter or other literature that contains obscene, immoral, scandalous, libelous or treasonable statements or any statement the truth of which cannot be established to the satisfaction of the city clerk."

On conviction, defendant was sentenced to pay a fine of $20 or be confined in the Detroit House of Correction for a period of 10 days.   Petition for writ of certiorari to the circuit court was denied. Defendant appeals, contending that the ordinance is unconstitutional in contravention of the Constitution of 1908, art. 2, § 4, of the State of Michigan, and is repugnant to the first and fourteenth amendments

to the Constitution of the United States. It is further claimed that the ordinance is unreasonable, arbitrary, beyond the charter powers of the city, and is a void delegation of legislative and judicial power to the city clerk, as well as an usurpation of the judicial power by the common council.

In *Lovell* v. *City of Griffin*, 303 U. S. 444 (58 Sup. Ct. 666), a similar question came before the United States supreme court. In that case the city of Griffin had enacted an ordinance providing ''That the practice of distributing, either by hand or otherwise, circulars, handbooks, advertising, or literature of any kind, whether said articles are being delivered free, or whether same are being sold, within the limits of the city of Griffin, without first obtaining written permission of the city manager of the city of Griffin, such practice shall be deemed a nuisance, and punishable as an offense against the city of Griffin.'' Plaintiff on appeal, Alma Lovell, was convicted of violating the ordinance by distributing a pamphlet without having first obtained a permit. On appeal to the supreme court the ordinance was held void as contrary to the fourteenth amendment to the Constitution. Chief Justice Hughes in speaking for the court said:

''Freedom of speech and freedom of the press, which are protected by the first amendment from infringement by congress, are among the fundamental personal rights and liberties which are protected by the fourteenth amendment from invasion by State action. * * * It is also well settled that municipal ordinances adopted under State authority constitutes State action and are within the prohibition of the amendment.

''The ordinance in its broad sweep prohibits the distribution of 'circulars, handbooks, advertising, or

literature of any kind.' It manifestly applies to pamphlets, magazines and periodicals. The evidence against appellant was that she distributed a certain pamphlet and a magazine called the 'Golden Age.' Whether in actual administration the ordinance is applied, as apparently it could be, to newspapers does not appear. * * * The ordinance is not limited to 'literature' that is obscene or offensive to public morals or that advocates unlawful conduct. There is no suggestion that the pamphlet and magazine distributed in the instant case were of that character. The ordinance embraces 'literature' in the widest sense.

''The ordinance is comprehensive with respect to the method of distribution. It covers every sort of circulation 'either by hand or otherwise.' There is thus no restriction in its application with respect to time or place. It is not limited to ways which might be regarded as inconsistent with the maintenance of public order or as involving disorderly conduct, the molestation of the inhabitants, or the misuse or littering of the streets. The ordinance prohibits the distribution of literature of any kind at any time, at any place, and in any manner without a permit from the city manager.

''We think that the ordinance is invalid on its face.''

The city of Dearborn contends that the ordinance in the instant case is distinguishable from that in the case above cited for the reason that, therein, no standards were provided to determine upon what grounds such a license would be refused; that in the case before us, the city of Dearborn had provided a standard with reference to such literature in that the issuance of the license was conditioned on the provision that it could be refused if the truth of ''any statement * * * cannot be established to the satisfaction of the city clerk.'' This makes the city clerk the sole judge of whether handbills, pamphlets,

leaflets or other literature can be distributed in the city of Dearborn.

There is no difference between such a standard and arbitrary power to forbid entirely the distribution of literature without a license.

"The struggle for the freedom of the press was primarily directed against the power of the licensor. It was against that power that John Milton directed his assault by his "Appeal for the Liberty of Unlicensed Printing." And the liberty of the press became initially a right to publish "*without* a license what formerly could be published only *with* one." While this freedom from previous restraint upon publication cannot be regarded as exhausting the guaranty of liberty, the prevention of the restraint was a leading purpose in the adoption of the constitutional provision. See *Patterson* v. *Colorado*, 205 U. S. 454, 462 (27 Sup. Ct. 556, 10 Ann. Cas. 689); *Near* v. *Minnesota*, 283 U. S. 697, 713–716 (51 Sup. Ct. 625); *Grosjean* v. *American Press Co.*, 297 U. S. 233, 245, 246 (56 Sup. Ct. 444). Legislation of the type of the ordinance in question would restore the system of license and censorship in its baldest form.

"The liberty of the press is not confined to newspapers and periodicals. It necessarily embraces pamphlets and leaflets. These indeed have been historic weapons in the defense of liberty, as the pamphlets of Thomas Paine and others in our own history abundantly attest. The press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion." *Lovell* v. *City of Griffin, supra.*

Under such a standard as claimed by counsel for the city, it would be the same as saying to every citizen: "You cannot distribute any pamphlet in which an opinion is expressed, unless we agree that it is the truth; and you will be imprisoned if you circu-

late such opinions unless you agree with us in what you say.'' This would effectually preclude the circulation not only of pamphlets, leaflets, and circulars at the arbitrary behest of a single official, but would also prevent the circulation of magazines whenever such censor would not agree with the opinions therein expressed. Under such ordinance the circulation of any published opinions or literature on matters of civic, economic, or scientific concern must agree with the opinions held by the city clerk. No religious pamphlet, no political circular or campaign literature could be disseminated unless such official agreed that the statements therein set forth were true, and that their truth had been established to his satisfaction.

It is said that the ordinance is a proper regulation to avoid littering the streets; but such contention appears to be nothing more than a subterfuge. There would be as much nuisance in littering the streets with pamphlets containing sentiments with which the city clerk did agree as with those containing statements ''The truth of which cannot be established to the satisfaction of the city clerk.''

The plain and direct effect of such ordinance, if enforced, would be to stifle and destroy the right to the expression and publication of all opinion on every controversial subject; and it would be surprising to find that such an ordinance would be enforced in all instances—against magazines of prominence, political parties, religious groups, and citizens of substance and distinction. Abuse of power and deprivation of rights can easily originate, and will be more usually found where the weak and defenseless are concerned. In this case, the ordinance was sought to be enforced against one of a group of impoverished working men without jobs and on relief rolls; and its probability of success could only be

reasonably predicated upon the obscurity and helplessness of the victim. But the defendant in this case, relying upon the bill of rights, has appealed to us to reverse his conviction, on the ground that it is in violation of the right of freedom of speech and freedom of the press.

These rights, wrung from the wilful grasp of oppressors on countless fields of carnage throughout the centuries at such gigantic cost of blood and anguish, are the accepted heritage of civilized people; and for free men, they are indubitable and imperishable—so deeply graven in the bill of rights that they cannot be smudged out either by obsequious hands or mailed fists. They are equally sacred and guarded in the high precincts of prominence and power as well as in the remote and obscure dwelling places of the unprotected and the dispossessed.

The ordinance in question is void on its face, in derogation of the right of freedom of speech and freedom of the press, as guaranteed by our Constitution. The conviction is reversed. The sentence of imprisonment is set aside; and the defendant is discharged.

BUTZEL, C. J., and WIEST, BUSHNELL, SHARPE, POTTER, CHANDLER, and NORTH, JJ., concurred.