[No. 34132. *En Banc.* February 27, 1958.]

JAY B. ADAMS *et al., Respondents,* v. VAN R. HINKLE, as *Supervisor of the Division of Children and Youth Services of the Department of Institutions, Appellant.*[1]

[1]Reported in 322 P. (2d) 844.

764

*The Attorney General* and *Stephen C. Way, Assistant,* for appellant.

*Burton C. Waldo* (of *Kahin, Carmody & Horswill*), for respondents.

*Donald McL. Davidson* and *Martin P. Detels, Jr., amici curiae.*

FOSTER, J.—Honorable Van R. Hinkle, supervisor of the division of children and youth services of the department of institutions, appeals from a permanent injunction in a declaratory judgment action (RCW chapter 7.24) enjoining him from enforcing the comic book act (Laws of 1955, chapter 282, p. 1231) because of its constitutional invalidity.

Respondents, who are retail and wholesale distributors of magazines, including comic books, and who were plaintiffs below, alleged in their complaint that the comic book act is void because it violates the first amendment to the Federal constitution, made applicable to the states by the fourteenth amendment, and constitutes a prior restraint upon the freedom of the press, which rights are, likewise, guaranteed by Art. I, § 5, of the state constitution, and, because of its vagueness, denies procedural due process required by the fourteenth amendment. The court below, while holding the act void because it violated the equal protection clause of the fourteenth amendment of the Federal constitution and Art. I, § 12, of the state constitution, declined to pass upon the other constitutional questions raised.

That the regulation of comic books is a matter of grave public concern is exemplified by the many private and legislative studies, reference to which may be found in the materials collected in the margin.[2]

---

[2]Duesenberg, Crime Comic Books: Government Control and Their Impact on Juvenile Conduct, 7 Mercer L. Rev. 331; Twomey, The Citizens' Committee and Comic-Book Control: A Study of Extragovernmental Restraint, 20 Law & Contemporary Problems 621; Lockhart & McClure, Literature, The Law of Obscenity, and the Constitution, 38 Minn. L. Rev. 295; 1 Chafee, Government & Mass Communications;

While the act is void on the two grounds specified by the court below, the importance of the problem compels us to deal with all of the constitutional issues raised.[3]

The act may be summarized as follows:

Section 1 declares that crime comic books are a factor in juvenile delinquency, and the act is, therefore, in the public interest.

Section 2 declares that the legislation is an exercise of the police power and enjoins a liberal construction of its provisions.

Section 3 defines wholesale, retail, dealer, supervisor and comic book, the latter definition alone being important for present purposes, and is as follows:

" 'Comic book' means any book, magazine or pamphlet, sold or distributed for profit, a major part of which consists

---

Desmond, Legal Problems Involved in Censoring the Media of Mass Communication, 40 Marquette L. Rev. 38; Crime Comics and the Constitution, 7 Stanford L. Rev. 237.

"As an indication of the importance of state legislation in the field of comic book control, The Council of State Governments in its *Suggested State Legislation Program for 1957* included a model statute regulating crime and sex comics, although also attaching the caveat that effective industry self-regulation was preferable to legislative action." 18 Ohio St. L. Jour. 512, 521.

See, also, Suggested State Legislative Program for 1957, Council of State Governments, 1957, pp. 105-107.

For a discriminating study of the problem from the British point of view, see Stevas, Obscenity and the Law (1956), especially the chapter entitled "Youth and Comics," pages 198-203. The English and other foreign statutes are collected in the appendix.

[3]"The Court's duty in these previous restraint cases is to decide particular disputes in a just manner while gradually developing criteria by which the terms of a valid licensing system might be determined through a knowledge of the law of the First Amendment. Local officials and the lower courts should be able to ascertain from the Supreme Court's decisions some idea of what constitutes a properly drawn statute or ordinance, one the Court will not declare unconstitutional. It is not the function of the Court to write model laws, but it is its function to assist legislators to write valid statutes by deciding cases that, taken as a whole, delineate a consistent pattern and serve as a guide. The Court has an additional duty: the pattern delineated must be one that lawmakers and public officials acting in good faith find it possible to follow. These functions the Court has failed to perform." Berns, Freedom, Virtue & The First Amendment 82.

of drawings depicting or telling a story of a real or fanciful event or series of events, with a substantial number of said drawings setting forth the spoken words of the characters with pointers, or brackets, or enclosures, or by such other means as will plainly indicate the character speaking such words: *Provided, however,* That no comic section of any regularly published daily or weekly newspaper shall be deemed to be a 'comic book' for the purposes of this act."

Section 4 makes sale of comic books or possession thereof with intent to sell without a prior license a crime, and imposes an increasing scale of penalties for subsequent violation.

Section 5 creates a rule of evidence that all comic books will appeal to minors, and that such presumption cannot be overcome by statements that they were not intended for minors.

Section 6 prescribes the fees for licenses.

Sections 7 and 9, separately dealt with hereafter, denounce comic book sales as a crime, and prescribe penalties.

Section 8 prohibits tie-in sales.

Section 10 authorizes the refusal of a license, or the revocation of one already issued, for the violation of RCW 9.68.010, which prohibits the sale of obscene literature.

Administrative hearings are sanctioned upon complaints addressed to license applications by section 11.

Section 12 deals with the refusal to license or the revocation of a license because of an interest in the business of a wholesaler whose license has been suspended or revoked.

Section 13 requires dealers to furnish the supervisor with three copies of every comic book before distribution or sale.

Section 14 deals with administrative authority.

Until the adoption of the fourteenth amendment,[4] the first eight amendments did not apply to states, but it is now settled by repeated decisions of the United States

---

[4]*Baron v. The Mayor & City Council of Baltimore,* 32 U. S. 242, 8 L. Ed. 672.

supreme court, collected in the margin,[5] that the fourteenth amendment made the first amendment prohibition against statutes abridging the freedom of speech or freedom of the press applicable to states.[6] We have so recognized it. *State ex rel. Holcomb v. Armstrong,* 39 Wn. (2d) 860, 239 P. (2d) 545; *State ex rel. Bolling v. Superior Court,* 16 Wn. (2d) 373, 133 P. (2d) 803.[7]

Appellant urges that we must presume the statute constitutional and relies upon *Gruen v. State Tax Commission,* 35 Wn. (2d) 1, 211 P. (2d) 651; *State ex rel. Campbell v. Case,* 182 Wash. 334, 47 P. (2d) 24; and *Poolman v. Langdon,* 94 Wash. 448, 162 Pac. 578. While this is true in other fields of constitutional law, it is not applicable in civil rights cases, that is, cases arising under the first amendment to the Federal constitution and Art. I, § 5, of the state constitution.

■ The sweep of the first amendment to the Federal constitution precludes the state from enacting any law

---

[5]*Murdock v. Pennsylvania,* 319 U. S. 105, 87 L. Ed. 1292, 63 S. Ct. 870, 891, 146 A. L. R. 81; *Thornhill v. Alabama,* 310 U. S. 88, 84 L. Ed. 1093, 60 S. Ct. 736; *Lovell v. Griffin,* 303 U. S. 444, 82 L. Ed. 949, 58 S. Ct. 666; *DeJonge v. Oregon,* 299 U. S. 353, 81 L. Ed. 278, 57 S. Ct. 255; *Grosjean v. American Press* Co., 297 U. S. 233, 80 L. Ed. 660, 56 S. Ct. 444; *Near v. Minnesota,* 283 U. S. 697, 75 L. Ed. 1357, 51 S. Ct. 625; *Stromberg v. California,* 283 U. S. 359, 75 L. Ed. 1117, 51 S. Ct. 532, 73 A. L. R. 1484; *Gitlow v. New York,* 268 U. S. 652, 69 L. Ed. 1138, 45 S. Ct. 625; *Patterson v. Colorado,* 205 U. S. 454, 51 L. Ed. 879, 27 S. Ct. 556.

[6]In *Adamson v. California,* 332 U. S. 46, 91 L. Ed. 1903, 67 S. Ct. 1672, 171 A. L. R. 1223, four members of the United States supreme court expressed the view that the purpose of the fourteenth amendment was to make the entire Bill of Rights applicable to state action. The available proofs have been exhaustively studied by Professor Charles Fairman of the Stanford University Law School, 2 Stanford L. Rev. 5, and by Professor Stanley Morrison of the Stanford University Law School, 2 Stanford L. Rev. 140. See, also, *Wolf v. Colorado,* 338 U. S. 25, 93 L. Ed. 1782, 69 S. Ct. 1359; Politics and the Constitution, 2 Crosskey, chapter XXXI, The True Meaning of the Fourteenth Amendment, p. 1083, and chapter XXXII, The Supreme Court's Transformation of the Fourteenth Amendment, p. 1119.

[7]But compare *State v. Haffer,* 94 Wash. 136, 143, 162 Pac. 45.

"One complete answer to this contention is that this amendment is, by its express language, only a limitation upon the power of Congress."

abridging the freedom of speech or press. In *Bridges v. California,* 314 U. S. 252, 263, 86 L. Ed. 192, 62 S. Ct. 190, 159 A. L. R. 1346, the United States supreme court declared:

"For the First Amendment does not speak equivocally. It prohibits any law 'abridging the freedom of speech, or of the press.' It must be taken as a command of the broadest scope that explicit language, read in the context of a liberty-loving society, will allow."

Consequently, there is no presumption of constitutionality of statutes abridging those rights. While the constitutional prohibition against such statutes is absolute, the courts have found exceptions: (1) military preparations in time of war; (2) obscenity; and (3) incitements to acts of violence. *Near v. Minnesota,* 283 U. S. 697, 75 L. Ed. 1357, 51 S. Ct. 625.

In *Burstyn, Inc. v. Wilson,* 343 U. S. 495, 504, 96 L. Ed. 1098, 72 S. Ct. 777, the court further said:

"In the light of the First Amendment's history and of the *Near* decision, the State has a heavy burden to demonstrate that the limitation challenged here presents such an exceptional case."

It is stated in 16 C. J. S. 388, 442, § 99:

"On the other hand, where rights, privileges, and immunities of the citizen are involved, the usual strong presumption in favor of constitutionality does not apply. This is true where the right of freedom of speech, thought, or association, or of the press, or of religion, or of assembly, is involved, so that when these questions are raised, the burden is on the state of justifying its application in each instance. In determining the validity of a statute which appears on its face to limit the exercise of a right specifically protected by the constitution, the presumption of validity is narrowed in its scope; and where a statute departs from the traditional precepts and practices of American lawmaking, the intendment which the judiciary customarily entertains in favor of the constitutionality of a statute loses much of its force."[8]

---

[8]*Kovacs v. Cooper,* 336 U. S. 77, 93, 93 L. Ed. 513, 69 S. Ct. 448, 10 A. L. R. (2d) 608; *Saia v. New York,* 334 U. S. 558, 562, 92 L. Ed. 1574, 68 S. Ct. 1148; *Marsh v. Alabama,* 326 U. S. 501, 509, 90 L. Ed. 265, 66 S. Ct. 276; *Thomas v. Collins,* 323 U. S. 516, 89 L. Ed. 430, 65 S. Ct. 315; *Follett v. McCormick,* 321 U. S. 573, 577, 88 L. Ed. 938, 64 S. Ct. 717,152 A. L. R. 317; *Prince v. Massachusetts,* 321 U. S. 158, 88 L. Ed. 645, 64 S. Ct. 438;

In *Busey v. District of Columbia,* 138 F. (2d) 592, the constitutionality of an act of Congress relating to the District of Columbia, regulating the street sale of all merchandise except newspapers without prior license, was challenged. Earlier the act was sustained, *Busey v. District of Columbia,* 129 F. (2d) 24, but Circuit Judge Rutledge, afterwards Mr. Justice Rutledge of the United States supreme court, dissented. The decision was reversed by the United States supreme court, 319 U. S. 579, 87 L. Ed. 1598, 63 S. Ct. 1277. Upon remand the court of appeals said:

"Freedoms of speech, press, and religion are entitled to a preferred constitutional position because they are 'of the very essence of a scheme of ordered liberty.' They are essential not only to the persons or groups directly concerned but to the entire community. Our whole political and social system depends upon them. Any interference with them is not only an abuse but an obstacle to the correction of other abuses. Because they are essential, the guarantees of free speech, press, and religion in the First Amendment, though not all constitutional guarantees, are within the 'liberty' which is protected by the due process clause of the Fourteenth Amendment. And in the recent flag salute case the Supreme Court said: 'The right of a State to regulate, for example, a public utility may well include, so far as the due process test is concerned, power

*Murdock v. Pennsylvania, supra; West Virginia Board of Education v. Barnette,* 319 U. S. 624, 639, 641, 87 L. Ed. 1628, 63 S. Ct. 1178, 147 A. L. R. 674; *Jones v. Opelika,* 316 U. S. 584, 600, 608, 86 L. Ed. 1691, 62 S. Ct. 1231, 141 A. L. R. 514; *Cantwell v. Connecticut,* 310 U. S. 296, 84 L. Ed. 1213, 60 S. Ct. 900, 128 A. L. R. 1352; *Schneider v. State,* 308 U. S. 147, 84 L. Ed. 155, 60 S. Ct. 146; *United States v. Carolene Products Co.,* 304 U. S. 144, 152-53, 82 L. Ed. 1234, 58 S. Ct. 778.

A contrary view was expressed by Mr. Justice Jackson in his dissenting opinion in *Brinegar v. United States,* 338 U. S. 160, 180, 93 L. Ed. 1879, 69 S. Ct. 1302, as follows:

"When this Court recently has promulgated a philosophy that some rights derived from the Constitution are entitled to 'a preferred position,' *Murdock v. Pennsylvania,* 319 U. S. 105, 115, dissent at p. 166; *Saia v. New York,* 334 U. S. 558, 562, I have not agreed. We cannot give some constitutional rights a preferred position without relegating others to a deferred position; we can establish no firsts without thereby establishing seconds. Indications are not wanting that Fourth Amendment freedoms are tacitly marked as secondary rights, to be relegated to a deferred position."

to impose all of the restrictions which a legislature may have a "rational basis" for adopting. But freedoms of speech and of press, of assembly, and of worship may not be infringed on such slender grounds.' The Supreme Court has specifically suggested that these freedoms may be entitled to special treatment in respect to the proof of facts on which the constitutionality of legislation depends. In sustaining a purely commercial regulation, the Court said: 'The existence of facts supporting the legislative judgment is to be presumed, for regulatory legislation affecting ordinary commercial transactions is not to be pronounced unconstitutional unless in the light of the facts made known or generally assumed it is of such a character as to preclude the assumption that it rests upon some rational basis * * *. There may be narrower scope for operation of the presumption of constitutionality when legislation appears on its face to be within a specific prohibition of the Constitution, such as those of the first ten Amendments, which are deemed equally specific when held to be embraced within the Fourteenth.' "

This court has taken the same position when, speaking through the late Judge Olson in *State ex rel. Holcomb v. Armstrong, supra,* it said:

"There is no presumption in favor of the constitutionality of any regulation involving civil rights."

■ The basic pattern of the act is to bring in to our law the despised censorship which expired in England seventy-two years before[9] the Continental Congress declared our independence. Now, more than two and one half centuries later, the legislature has recreated it in Washington by requiring a license of anyone selling or possessing for sale any book, magazine, or pamphlet consisting of drawings "depicting or telling a story of a real or fanciful event or series of events, with a substantial number of the said drawings setting forth the spoken words of the characters with pointers, or brackets, or enclosures," indicating the character speaking such words. By the terms of the act, no one may sell or even possess

---

[9] 6 Holdsworth's History of English Law 360, 379.

such a book, magazine, or pamphlet for purposes of sale unless he first obtains a license.

If a person sells such a book, pamphlet, or magazine without a license, he is to be punished, not for selling something which may be considered harmful, but for selling without a license. This device is prior restraint in its most abhorrent form.

Prior restraint and subsequent punishment have been differentiated by a distinguished legal scholar, Professor Thomas I. Emerson of the Yale Law School, in the following passages:

"The concept of prior restraint, roughly speaking, deals with official restrictions imposed upon speech or other forms of expression in advance of actual publication. Prior restraint is thus distinguished from subsequent punishment, which is a penalty imposed after the communication has been made as a punishment for having made it. Again speaking generally, a system of prior restraint would prevent communication from occurring at all; a system of subsequent punishment allows the communication but imposes a penalty after the event. Of course, the deterrent effect of a later penalty may operate to prevent a communication from ever being made. . . .

"Several features of the doctrine should be observed at the outset. In the first place, the doctrine deals with limitations of form rather than of substance. The issue is not whether the government may impose a particular restriction of substance in an area of public expression, such as forbidding obscenity in newspapers, but whether it may do so by a particular method, such as advance screening of newspaper copy. In other words, restrictions which could be validly imposed when enforced by subsequent punishment are, nevertheless, forbidden if attempted by prior restraint. The major considerations underlying the doctrine of prior restraint, therefore, are matters of administration, techniques of enforcement, methods of operation, and their effect upon the basic objectives of the First Amendment." 20 Law and Contemporary Problems 648.

In Laws of 1955, chapter 282, § 1, crime comic books are declared to contribute to juvenile delinquency and to be a source of crime. Yet, the legislation is not restricted

to "crime comic books," nor are such subsequently mentioned anywhere in the act. On the other hand, a license is required for the sale of any such book, magazine, or pamphlet, either harmful or innocent, and to adults or juveniles alike.

The act is devoid of any standards by which the supervisor is to be guided in issuing a license. It is left entirely to his whim and caprice. He may issue or deny for any reason, or for no reason. Section 10 authorizes the supervisor to refuse a license, or to suspend or revoke one already issued, if he shall find that the dealer has violated the criminal law relating to obscenity (RCW 9.68.010). A conviction in a court of competent jurisdiction is not required for this purpose, but only that the supervisor shall find that a dealer has violated the criminal law. We need not stop to inquire if this section violates the tenth amendment, which provides that in criminal prosecutions the defendant shall "have a speedy public trial by an impartial jury of the county in which the offense is charged to have been committed and the right to appeal in all cases."

Section 11 provides for a hearing upon a complaint opposing the issuance of a license or the revocation of one already granted. But again, no standards are established to guide the supervisor in such determination and there is no requirement that any hearing ever be held.

The statute struck down as an unconstitutional prior restraint in *Near v. Minnesota, supra,* authorized the injunctive process to prohibit future publications of a newspaper because of prior scandalous articles. The court's opinion contains the following significant passages:

"In determining the extent of the constitutional protection, it has been generally, if not universally, considered that it is the chief purpose of the guaranty to prevent previous restraints upon publication. . . .

"That is undoubtedly true; the protection even as to previous restraint is not absolutely unlimited. But the limitation has been recognized only in exceptional cases: . . .

"The exceptional nature of its limitations places in a

strong light the general conception that liberty of the press, historically considered and taken up by the Federal Constitution, has meant, principally although not exclusively, immunity from previous restraints or censorship."

Previous restraint was next dealt with by the United States supreme court in 1935, when it held void the Louisiana act imposing a tax of two per cent of gross revenue upon all newspapers with more than twenty *thousand* circulation. The history of prior restraint was summarized by Mr. Justice Sutherland, for a unanimous court, in *Grosjean v. American Press Co.*, 297 U. S. 233, 245, 249, 80 L. Ed. 660, 56 S. Ct. 444, in these words:

"For more than a century prior to the adoption of the amendment—and, indeed, for many years thereafter—history discloses a persistent effort on the part of the British government to prevent or abridge the free expression of any opinion which seemed to criticize or exhibit in an unfavorable light, however truly, the agencies and operations of the government. The struggle between the proponents of measures to that end and those who asserted the right of free expression was continuous and unceasing. As early as 1644, John Milton, in an 'Appeal for the Liberty of Unlicensed Printing,' assailed an act of Parliament which had just been passed providing for censorship of the press previous to publication. He vigorously defended the right of every man to make public his honest views 'without previous censure'; and declared the impossibility of finding any man base enough to accept the office of censor and at the same time good enough to be allowed to perform its duties. Collett, History of the Taxes on Knowledge, vol. I, pp. 4-6. The act expired by its own terms in 1695. It was never renewed; and the liberty of the press thus became, as pointed out by Wickwar (The Struggle for the Freedom of the Press, p. 15), merely 'a right or liberty to publish *without* a license what formerly could be published only *with* one.' "

Previous restraint was again condemned in these words:

"In the light of all that has now been said, it is evident that the restricted rules of the English law in respect of the freedom of the press in force when the *Constitution* was adopted were never accepted by the American colonists, and that by the First Amendment it was meant to preclude

the national government, and by the Fourteenth Amendment to preclude the states, from adopting any form of previous restraint upon printed publications, or their circulation, including that which had theretofore been effected by these two well-known and odious methods." *Grosjean v. American Press Co.*, 297 U. S. 233, 249, 80 L. Ed. 660, 56 S. Ct. 444.

The license requirements of the act in question are not essentially different than the ordinance held unconstitutional in *Lovell v. Griffin*, 303 U.S. 444, 82 L. Ed. 949, 58 S. Ct. 666, because it prohibited distribution of all literature without prior permit. On January 13, 1958, in *Staub v. City of Baxley*, 355 U. S. 313, 2 L. Ed. (2d) 302, 78 S. Ct. 277, the United States supreme court again reviewed the prior restraint cases and reiterated its views in unmistakable language.

"It is settled by a long line of recent decisions of this Court that an ordinance which, like this one, makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official—as by requiring a permit or license which may be granted or withheld in the discretion of such official—is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms." *Staub v. City of Baxley, supra.*

 The act in question is void on its face because it requires a prior license for the publication of all comic books, harmless and harmful, good and bad alike. While ostensibly aimed at sales to minors, it is not so limited. It applies to all sales and to all people.[10]

Other cases dealing with statutes void because of prior restraint are collected in the margin.[11]

---

[10]While the availability of the prior restraint device to keep materials which are considered harmful away from children was alluded to in *Prince v. Massachusetts*, 321 U. S. 158, 88 L. Ed. 645, 64 S. Ct. 438, no other case touching that issue has come to our notice and the problem is not presented by this record. Consequently, we express no opinion upon it.

[11]*Saia v. New York, supra; Thornhill v. Alabama, supra; Burstyn, Inc. v. Wilson, supra; Holmby Productions v. Vaughn*, 350 U. S. 870, 100 L.

In oral argument, the attorney general placed reliance upon the three cases decided by the supreme court June 24, 1957. Two of them, *Roth v. United States* and *Alberts v. California*, 354 U. S. 476, 1 L. Ed. (2d) 1498, 77 S. Ct. 1304, deal only with obscenity. All that was decided is contained in the following sentence:

"We hold that obscenity is not within the area of constitutionally protected speech or press."

By § 207 of the criminal code of 1909 (Laws of 1909, chapter 249, § 207, p. 951, *cf.* RCW 9.68.010), obscene literature is prohibited without exception, and the license requirements of the act in question are not based upon any aspect of obscenity. While the third case, *Kingsley Books, Inc. v. Brown*, 354 U. S. 436, 1 L. Ed. (2d) 1469, 77 S. Ct. 1325, likewise dealt with obscenity and could be put aside upon that ground, it must be noticed because of the attorney general's argument that it sanctions prior restraint. But that aspect of the case was limited to the future distribution of a published book admitted to be obscene under the New York criminal law, and already condemned as such.

The New York statute, which is set out in full in the margin in the opinion of the supreme court of the United States (*Kingsley Books, Inc. v. Brown*, 354 U. S. 436, 437, 1 L. Ed. (2d) 1469, 77 S. Ct. 1325), authorizes officials to seize printed matter of an indecent character which is "obscene, lewd, lascivious, filthy, indecent or disgusting, or which contains an article or instrument of indecent or immoral use or purports to be for indecent or immoral use or purpose," and authorizes an injunction against the further sale or distribution of such printed matter. Section 22-a (2) authorizes distributors of the offensive materials to be entitled to a trial within one day after issue is joined.

---

Ed. 770, 76 S. Ct. 117; *Superior Films v. Department of Education of Ohio*, 346 U. S. 587, 98 L. Ed. 329, 74 S. Ct. 286; *Niemotko v. Maryland*, 340 U. S. 268, 95 L. Ed. 267, 71 S. Ct. 325; *Hague v. CIO*, 307 U. S. 496, 83 L. Ed. 1423, 59 S. Ct. 954. Among the law review articles are: Prior Restraint—A Test of Invalidity in Free Speech Cases?, 49 Columbia L. Rev. (1949) 1001; Constitutional Law—Free Press—Prior Restraints of Obscenity, 41 Minn. L. Rev. (1956) 222.

We are told, *Brown v. Kingsley Books, Inc.*, 1 N. Y. (2d) 177, 180, 134 N. E. (2d) 461, 151 N. Y. S. (2d) 639, that the defendants conceded the materials to be obscene and filthy, and that they would have had no defense to a criminal prosecution for a violation of the New York obscenity law, nor was the test of obscenity challenged. The court of appeals said the "defendants' sole attack upon the statute is that the remedy by injunction constitutes an unconstitutional 'prior restraint'," prohibited by the first and fourteenth amendments to the United States constitution and the corresponding provision of the New York constitution.

The New York court was at pains to point out that the statute was applicable only after publication and did not apply to future publications, and that the statute was to be contrasted with "the usual features of advance censorship," and that there was no greater interference with the freedom of the publisher or vendor than by a criminal prosecution. The statute was limited to obscenity, and the court of appeals said that its decision should not be taken "as sanctioning the injunctive process in dealing with other objectionable or antisocial material, such as libel." Guarding against the evils condemned in *Near v. Minnesota, supra,* attention was directed to the fact that the injunction in the *Near* case applied to the publication and distribution "of material to be written or produced in the future," and that the city sought to so extend the injunction which the court said "the trial court very properly refused to do."

Three of the judges of the New York court of appeals expressed the view the decision should be limited to the one point that the first amendment does not protect obscene books against prior restraint.

The supreme court of the United States affirmed five to four, with three separate dissenting opinions. Mr. Justice Frankfurter, for the court, observed that the state court, in the injunction under review, limited its application to the book in question and refused to extend it to later issues. The review was, of course, limited to the question of

whether the Federal constitution was violated by the statute in question. The court made it abundantly clear that *Alberts v. California, supra,* and prior decisions, excluded obscene publications from the protection of the first amendment. The court said that both criminal enforcement and the injunctive procedure authorized by the New York statute operated at the same stage. "In each situation the law moves after publication; the book need not in either case have yet passed into the hands of the public." The book in question had been on sale for several weeks when the proceeding was instituted, and the distributors were enjoined only from distributing the book already published which had been adjudged obscene. Referring to the *Near* injunctions on applications to future publications, the court concluded:

"Unlike *Near,* § 22-a is concerned solely with obscenity and, as authoritatively construed, it studiously withholds restraint upon matters not already published and not yet found to be offensive."

The chief justice in his dissent considered the statute unconstitutional because of the lack of standards. He thought that, unless the intent of the individual was considered instead of the character of the publication, there existed an unconstitutional prior restraint.

Justices Douglas and Black thought it void as a prior restraint. Mr. Justice Brennan thought it unconstitutional because there was no provision that a jury should determine whether the objectionable publication in question was obscene.[12]

---

[12]Judge Driver in the eastern district of Washington condemned a great number of nudist magazines, because the great preponderance of the illustrations depicted "shapely, well-developed young women appearing in the nude," in *United States v. 4200 Copies International Journal,* 134 F. Supp. 490, as obscene within the meaning of 19 U. S. C. A., § 1305, prohibiting importation of obscene books or pamphlets. The court of appeals (C.C.A. 9th) affirmed in 247 F. (2d) 148. On Monday, December 9, 1957, the United States supreme court on certiorari, *Mounce v. United States,* No. 542, remanded to the court of appeals for consideration in light of *Roth v. United States, supra.*

We have here a prior restraint in the most unrestricted form. It is a licensing act in the seventeenth century mold and is void on its face.

■ Because distribution is an integral element of freedom of the press, *Lovell v. Griffin, supra; Winters v. New York,* 333 U. S. 507, 509, 92 L. Ed. 840, 68 S. Ct. 665, it. is covered by what has been said respecting other phases of the statute, and separate discussion is unnecessary of respondents' argument that § 4 unlawfully regulates distribution and sale of magazines.

■ There is still another reason why §§ 7 and 9 are void. Both sections apply to all sales, that is, to minors and adults alike. Neither section is essentially different from the Michigan penal code, § 343, set out in the margin,[13] which was held unconstitutional by the supreme court of the United States in *Butler v. Michigan,* 352 U. S. 380, 1 L. Ed. (2d) 412, 77 S. Ct. 524. In condemning that act as unconstitutional under the first amendment, the court held:

"The State insists that, by thus quarantining the general reading public against books not too rugged for grown men and women in order to shield juvenile innocence, it is exercising its power to promote the general welfare. Surely, this is to burn the house to roast the pig. Indeed, the Solicitor General of Michigan has, with characteristic candor, advised the Court that Michigan has a statute specifically designed to protect its children against obscene

---

[13] " 'Any person who shall import, print, publish, sell, possess with the intent to sell, design, prepare, loan, give away, distribute or offer for sale, any book, magazine, newspaper, writing, pamphlet, ballad, printed paper, print, picture, drawing, photograph, publication or other thing, including any recordings, containing obscene, immoral, lewd of lascivious language, or obscene, immoral, lewd or lascivious prints, pictures, figures or descriptions, tending to incite minors to violent or depraved or immoral acts, manifestly tending to the corruption of the morals of youth, or shall introduce into any family, school or place of education or shall buy, procure, receive or have in his possession, any such book, pamphlet, magazine, newspaper, writing, ballad, printed paper, print, picture, drawing, photograph, publication or other thing, either for the purpose of sale, exhibition, loan or circulation, or with intent to introduce the same into any family, school or place of education, shall be guilty of a misdemeanor.' " *Butler v. Michigan,* 352 U. S. 380, 381, 1 L. Ed. (2d) 412, 77 S. Ct. 524.

matter 'tending to the corruption of the morals of youth.' But the appellant was not convicted for violating this statute.

"We have before us legislation not reasonably restricted to the evil with which it is said to deal. The incidence of this enactment is to reduce the adult population of Michigan to reading only what is fit for children. It thereby arbitrarily curtails one of those liberties of the individual, now enshrined in the Due Process Clause of the Fourteenth Amendment, that history has attested as the indispensable conditions for the maintenance and progress of a free society."

It may be assumed, for present purposes, that, in order to protect minors from evil, the legislature might restrict the sale of offensive literature to them, but this statute prohibits all sales of comic books to all people, adults and juveniles alike. In § 1, the legislature found "crime comic books" to be a basic factor contributing to the delinquency of minors, but it did not define "crime comic books" or restrict only the sale of such books, but the act prohibits the sale of all comic books, good and bad, "crime comic books" and noncrime comic books. Nor did it limit the penalties to sales to minors, but prohibited all sales. It was specifically decided in *Butler v. Michigan, supra,* that this is unconstitutional.

Respondents urge that §§ 7, 9, and 10 are so vague and indefinite as to violate their right of procedural due process; §§ 7 and 9 are not essentially different from the New York criminal statute held unconstitutional in *Winters v. New York, supra:*

Section 7 is:

"No dealer shall print, publish, design, prepare, import, distribute, exhibit, display, sell or possess with intent to sell, or offer to sell any comic book appealing to or likely to be read or looked at by minors under the age of eighteen years which is obscene or indecent; or which is devoted to the publication or exploitation of fictional or actual deeds of violent bloodshed, lust, crime or immorality by characters depicted either as real or fanciful, human or inhuman, so massed as reasonably to tend to incite minors to violence or depraved or immoral acts against the person."

Section 9 is:

"Any dealer who sells or distributes commercially or has in his possession with intent to sell, distribute commercially, or who otherwise offers for sale or commercial distribution any comic book appealing to or likely to be read or looked at by minors under the age of eighteen years, which is devoted to the publication and exploitation of fictional or actual deeds of violent bloodshed, lust, crime or immorality by characters depicted either as real or fanciful, human or inhuman, so massed as reasonably to tend to incite minors to violence or depraved or immoral acts against the person, shall be guilty of a misdemeanor. Upon a second conviction for violation of this section, the dealer shall be punished as for a gross misdemeanor, and upon a third conviction as for a felony."

Section 1141 (2) of the New York penal code reads as follows:

" '§ 1141. Obscene prints and articles

" '1. A person . . . who,

" '2. Prints, utters, publishes, sells, lends, gives away, distributes or shows, or has in his possession with intent to sell, lend, give away, distribute or show, or otherwise offers for sale, loan, gift or distribution, any book, pamphlet, magazine, newspaper or other printed paper devoted to the publication, and principally made up of criminal news, police reports, or accounts of criminal deeds, or pictures, or stories of deeds of bloodshed, lust or crime; . . .

" '. . . . . .

" 'Is guilty of a misdemeanor, . . .' "

The New York court of appeals attempted to save the New York statute by reading into it a requirement that the offensive material be so "massed" as to become "vehicles for inciting violent and depraved crimes" against the person.

The court said that because lewdness was punishable under another statute (and that is likewise true in Washington, RCW 9.68.010), it is the massing as an incitation to crime that is the important element.

The United States supreme court said such construction put the words into the act to the same extent as if done by the legislature itself.

That language was incorporated in the text of the Washington statute.

In the *Winters* case, the court summarized the requirement of definiteness as follows:

"It is settled that a statute so vague and indefinite, in form and as interpreted, as to permit within the scope of its language the punishment of incidents fairly within the protection of the guarantee of free speech is void, on its face, as contrary to the Fourteenth Amendment. *Stromberg v. California,* 283 U. S. 359, 369; *Herndon v. Lowry,* 301 U. S. 242, 258. A failure of a statute limiting freedom of expression to give fair notice of what acts will be punished and such a statute's inclusion of prohibitions against expressions, protected by the principles of the First Amendment, violates an accused's rights under procedural due process and freedom of speech or press." *Winters v. New York,* 333 U. S. 507, 509, 92 L. Ed. 840, 68 S. Ct. 665.

The court's condemnation of the New York act applies with full force to the Washington act. The two cannot be differentiated. Sections 7 and 9 fall within the condemnation of the *Winters* case. The court there held:

"The subsection of the New York Penal Law, as now interpreted by the Court of Appeals, prohibits distribution of a magazine principally made up of criminal news or stories of deeds of bloodshed or lust, so massed as to become vehicles for inciting violent and depraved crimes against the person. But even considering the gloss put upon the literal meaning by the Court of Appeals' restriction of the statute to collections of stories 'so massed as to become vehicles for inciting violent and depraved crimes against the person . . . not necessarily . . . sexual passion,' we find the specification of publications, prohibited from distribution, too uncertain and indefinite to justify the conviction of this petitioner. Even though all detective tales and treatises on criminology are not forbidden, and though publications made up of criminal deeds *not characterized by bloodshed or lust are omitted from* the interpretation of the Court of Appeals, we think fair use of collections of pictures and stories would be interdicted because of the utter impossibility of the actor or the trier to know where this new standard of guilt would draw the line between the allowable and the forbidden publications. No intent or purpose is required—no indecency or obscenity in any sense heretofore known to the law. 'So massed as to incite to crime' can become meaningful only by concrete instances. This one example is not enough. The clause proposes to punish the printing and circulation of publications that courts or juries may think influence generally persons to commit crimes of violence against the

person. No conspiracy to commit a crime is required. See *Musser v. Utah,* 333 U. S. 95. It is not an effective notice of new crime. The clause has no technical or common law meaning. Nor can light as to the meaning be gained from the section as a whole or the Article of the Penal Law under which it appears. As said in the *Cohen Grocery Company* case, *supra,* p. 89 [255 U. S. 81, 65 L. Ed. 516, 41 S. Ct. 298]:

" 'It leaves open, therefore, the widest conceivable inquiry, the scope of which no one can foresee and the result of which no one can foreshadow or adequately guard against.'

"The statute as construed by the Court of Appeals does not limit punishment to the indecent and obscene, as formerly understood. When stories of deeds of bloodshed, such as many in the accused magazines, are massed so as to incite to violent crimes, the statute is violated. It does not seem to us that an honest distributor of publications could know when he might be held to have ignored such a prohibition. Collections of tales of war horrors, otherwise unexceptionable, might well be found to be 'massed' so as to become 'vehicles for inciting violent and depraved crimes.' Where a statute is so vague as to make criminal an innocent act, a conviction under it cannot be sustained. *Herndon v. Lowry,* 301 U. S. 242, 259."

■ Sections 7 and 9 fail to meet the procedural due process requirements of the fourteenth amendment. The act is void on its face. It is "overbroad."[14]

By § 3 (4), comic sections of newspapers are exempted from license requirements. With commendable candor, the attorney general, in argument at our bar, admitted that newspapers might print or publish anything found in any

---

[14]For text discussions, see: 61 Harvard L. Rev. 1208; Constitutional Law—Freedom of Press—Need for Certainty in Statutes Inhibiting Same, 17 Journal of the Bar Association of Kansas 247; Constitutional Law—Interpretation of Criminal Statutes—Obscenity Statute Void for Indefiniteness, 23 Notre Dame Lawyer 602; Void for Vagueness: An Escape from Statutory Interpretation, 23 Ind. L. Jour. 272; Constitutional Law—Due Process—State Criminal Statute Banning Publications Exploiting Accounts of Violent Crime Void for Indefiniteness, 96 Pa. L. Rev. 889; Constitutional Law—Due Process—Statute Held Void for Uncertainty, 22 So. Cal. L. Rev. 298; Constitutional Law—Due Process— New York Obscene Prints and Articles Statute Held Unconstitutional, 9 Ohio St. L. Jour. 346.

comic book without being subject to the restrictions imposed. Newspapers are entirely free of any restriction. Such discrimination is prohibited by Art. I, § 12 of the Washington constitution which is:

"No law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations."

and by the equal protection of the fourteenth amendment to the United States constitution.

█ The attorney general earnestly contends that this is a reasonable classification, and that the legislature has a right to classify if there be a rational basis for the classification. But this is not so when the equal protection clause is concerned with a right claimed under the first amendment. The matter was dealt with at length by the supreme court of the United States in *West Virginia State Board of Education v. Barnette*, 319 U. S. 624, 87 L. Ed. 1628, 63 S. Ct. 1178. The conclusions reached are contained in the following paragraph:

"In weighing arguments of the parties it is important to distinguish between the due process clause of the Fourteenth Amendment as an instrument for transmitting the principles of the First Amendment and those cases in which it is applied for its own sake. The test of legislation which collides with the Fourteenth Amendment, because it also collides with the principles of the First, is much more definite than the test when only the Fourteenth is involved. Much of the vagueness of the due process clause disappears when the specific prohibitions of the First become its standard. The right of a State to regulate, for example, a public utility may well include, so far as the due process test is concerned, power to impose all of the restrictions which a legislature may have a 'rational basis' for adopting. But freedoms of speech and of press, of assembly, and of worship may not be infringed on such slender grounds. They are susceptible of restriction only to prevent grave and immediate danger to interests which the State may lawfully protect. It is important to note that while it is the Fourteenth Amendment which bears directly upon the State it is the more specific limiting principles of the First Amendment that finally govern this case."

When the rights claimed are among those protected from legislative invasion by the first amendment, the equal protection clause of the fourteenth amendment assumes increased importance. The words of the supreme court of Michigan in *City of Dearborn v. Ansell*, 290 Mich. 348, 354, 287 N. W. 551, bear repetition:

"These rights, wrung from the wilful grasp of oppressors on countless fields of carnage throughout the centuries at such gigantic cost of blood and anguish, are the accepted heritage of civilized people; and for free men, they are indubitable and imperishable—so deeply graven in the bill of rights that they cannot be smudged out either by obsequious hands or mailed fists."

Even if considered separately from a right guaranteed by the first amendment, the constitutionality of such a classification is precarious at best. Only last term the United States supreme court in *Morey v. Doud*, 354 U. S. 457, 1 L. Ed. (2d) 1485, 77 S. Ct. 1344, held an Illinois statute, exempting the American Express Company from regulation in the sale of money orders, to be void under the equal protection clause of the fourteenth amendment. In *State ex rel. Bacich v. Huse*, 187 Wash. 75, 59 P. (2d) 1101, we said that the aim and purpose of the applicable constitutional provisions of both the state and Federal constitutions is to secure equality of treatment of all persons without undue favor on the one hand or hostile discrimination on the other. In *Seattle v. Rogers*, 6 Wn. (2d) 31, 106 P. (2d) 598, 130 A. L. R. 1498, we held a Seattle ordinance invalid which required licenses of solicitors for charitable purposes but exempted community fund solicitors. Other cases holding similar ordinances or statutes to be void for the same reasons are collected in the margin.[15]

---

[15]*Olsen v. Delmore*, 48 Wn. (2d) 545, 295 P. (2d) 324; *Power, Inc. v. Huntley*, 39 Wn. (2d) 191, 235 P. (2d) 173; *Ralph v. Wenatchee*, 34 Wn. (2d) 638, 209 P. (2d) 270; *In re Hendrickson*, 12 Wn. (2d) 600, 123 P. (2d) 322; *Manos v. Seattle*, 173 Wash. 662, 24 P. (2d) 91; *Verino v. Hickey*, 135 Wash. 71, 237 Pac. 5; *Kaufman v. West*, 133 Wash. 192, 233 Pac. 321; *Sherman Clay & Co. v. Brown*, 131 Wash. 679, 231 Pac. 166; *State v. W. W. Robinson Co.*, 84 Wash. 246, 146 Pac. 628; *Seattle*

■ With respect to freedom of the press, the legislature may not exact from dealers in comic books a pre-publication license while immunizing newspapers from the same requirements in the publication and distribution of the identical materials. The equal protection provisions of the fourteenth amendment and Art. I, § 12 of the Washington constitution forbid.

Respondent contends that § 5, set out in the margin,[16] violates the due process clause of the fourteenth amendment and Art. I, § 3 of the state constitution.

"No person shall be deprived of life, liberty, or property, without due process of law." Art. I, § 3, Washington State Constitution.

The argument is that the statutory declaration that all comic books are presumed to appeal to minors, and consequently used by them, becomes conclusive by the concluding sentence in the section that the presumption may not be overcome by a declaration that they are not intended for minors.

■ The constitution prohibits a statute from creating a conclusive presumption. *Heiner v. Donnan*, 285 U. S. 312, 76 L. Ed. 772, 52 S. Ct. 358, 12 Am. Jur. 317, § 625. This the attorney general concedes. While a rule of evidence may be created by statute (*State v. Sears*, 4 Wn. (2d) 200, 103 P. (2d) 337), there must be a rational connection between the facts declared to constitute *prima facie* proof of the fact to be proved and the fact presumed. Annotation, 162 A. L. R. 495; 51 A. L. R. 1139; 86 A. L. R. 179.

■ The section does not undertake to create a conclusive presumption because it may be overcome by evidence, and, therefore, does not offend against the consti-

---

*v. Dencker*, 58 Wash. 501, 108 Pac. 1086; *Bacon v. Locke*, 42 Wash. 215, 83 Pac. 721; *In re Camp*, 38 Wash. 393, 80 Pac. 547; *Nathan v. Spokane County*, 35 Wash. 26, 76 Pac. 521.

[16]"For the purposes of this act, all comic books shall be presumed to be appealing to and likely to be read or looked at by minors under the age of eighteen. This presumption may not be overcome by statements to the effect that the comic book was not intended for juveniles under the age of eighteen years."

tutional provisions relied upon. 16 C. J. S. 514, 527, § 128 (d).

Respondent urges that the title[17] of the act in question is in violation of Art. II, § 19 of the Washington constitution, but, because of the more basic constitutional infirmities already noticed, we find it unnecessary to resolve this issue. It should not recur because we have amply delineated the constitutional requirements in our decided cases.

Affirmed.

MALLERY, DONWORTH, WEAVER, and ROSELLINI, JJ., concur.

FINLEY, J. (concurring in the result)—One objective of the majority opinion is to provide a guide for the assistance of legislators in redrafting á valid, regulatory measure relative to crime comics, if they wish to do so. The objective recognizes—and attempts to do something constructive in correlating functions and actions of—the two independent, co-ordinate branches of the state government: the judicial and the legislative. I think this is highly desirable. However, in my judgment, the effect of the majority opinion considered as a whole is to preclude future attempts at regulation of comic books. Specifically, I have in mind the very practicable consideration that the opinion prohibits the legislature from regulating the distribution of comic books unless it also regulates the distribution of newspapers, which, incidentally, contain comic strips or comic sections. I am unwilling to go that far.

Normally, the courts, in considering the constitutionality of an enactment of the state legislature, give weight and effect to a presumption of law that such enactments are valid, and that the burden of proving otherwise rests upon the party asserting unconstitutionality. The majority opinion states that the judicial presumption of constitutionality does not apply when an enactment seeks to regulate a right guaranteed by the first amendment. I agree

[17]"AN ACT relating to comic books; regulating their distribution and sale; prohibiting distribution and sale of certain crime comic books to minors; providing penalties."

that this proposition is well settled, currently, or a least for the present, by decisions of the United States supreme court. I also agree that, under the decisions, the fourteenth amendment makes the first amendment applicable to state action.

While, as indicated, I agree with the foregoing principles; nevertheless, I believe that the majority opinion errs in applying them in the instant case. It is the *due process clause* of the fourteenth amendment—*not its equal protection clause*—which picks up and makes the first amendment safeguards applicable to *state action*. A determination that a statute does or does not grant equal protection is completely distinct from a determination that a statute does or does not violate due process. I believe the majority opinion fails to note this distinction by holding that the presumption of constitutionality does not apply to the classification set up by the legislature in the comic book statute. If the statute is invalid on classification grounds— *i.e.,* because (as stated by the majority opinion) it fails to grant constitutional equal protection to respondents— the particular invalidity is attributable exclusively to the fourteenth amendment itself (equal protection clause) and not because an application of the first amendment is brought into play by or through the due process clause of the fourteenth amendment. When a statute is attacked as violative of the equal protection clause, it makes no difference whether the legislature is classifying animals, cars, religion, or the press; the question is always the same: Is the classification reasonable?

It is only when state action is challenged as violative of first amendment rights as applied through the due process clause of the fourteenth amendment that the presumption of constitutionality is inapplicable. Such was the situation in the United States supreme court case which is quoted as authority by the majority. *West Virginia State Board of Education v. Barnette,* 319 U. S. 624, 87 L. Ed. 1628, 63 S. Ct. 1178, 147 A. L. R. 674. In that case, the right concerned was the freedom of religion.

I agree with the majority that *certain sections* of the comic book statute transgress rights guaranteed by the first amendment, and that, as to these, there is no presumption of constitutionality. However, if one section of a statute does not receive the benefit of the presumption of constitutionality, there is no reason to withhold or deny the benefit of the presumption as to other sections which are in no way related to the *due process rights* guaranteed *by the first amendment.*

For the reasons indicated, I believe the presumption of constitutionality applies in determining the question of whether the comic book statute grants equal protection of the laws. The problem then is the *reasonableness of the classification* established by the statute. In considering this, we could do well to bear in mind the following words of Justice Frankfurter in *Tigner v. Texas* (1940), 310 U. S. 141, 84 L. Ed. 1124, 60 S. Ct. 879, 130 A. L. R. 1321:

"The equality at which the 'equal protection' clause aims is not a disembodied equality. The Fourteenth Amendment enjoins 'the equal protection of the laws,' and laws are not abstract propositions. They do not relate to abstract units A, B and C, but are expressions of policy arising out of specific difficulties, addressed to the attainment of specific ends by the use of specific remedies. The Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same."

After studying the relationship between crime comics and juvenile delinquency, the legislature apparently concluded that the comic strips carried in newspapers were not the offenders. It then drafted a statute designed to reach the offenders. Grammar school students, adolescents, and even numerous adults who are addicted to the reading of comic books would have no difficulty in distinguishing between comic books, as such, and comic sections of a daily or weekly newspaper. It is my view that the classification as determined and fixed by the legislature is a reasonable one.

The act in question (Laws of 1955, chapter 282, § 3 (4), pp. 1231, 1232) defines comic books as follows:

". . . any book, magazine or pamphlet, sold or distributed for profit, *a major part of which consists of drawings depicting or telling a story* of a real or fanciful event or series of events, with a substantial number of said drawings setting forth the spoken words of the characters with pointers, or brackets, or enclosures, or by such other means as will plainly indicate the character speaking such words: *Provided, however,* That *no comic section* of any regularly published daily or weekly newspaper shall be deemed to be a 'comic book' for the purpose of this act; . . ." (Italics mine.)

It is clear to me that even without the proviso the act does not cover or attempt to regulate comic sections of newspapers for the simple reason that only a page or two— *i.e.,* only a minor portion of newspapers—is devoted to comic strips. To me it seems anomalous that the addition of a gratuitous proviso by the legislature should be responsible for this court holding the act involved unconstitutional as an infringement of the equal protection clause.

As authority that the statutory classification under consideration is unreasonable, the majority refer to a recent United States supreme court case. *Morey v. Doud* (1957), 354 U. S. 457, 1 L. Ed. (2d) 1485, 77 S. Ct. 1344. Therein, the supreme court invalidated a statute which purported to regulate all companies issuing money orders, but exempted one named company. I fail to see the similarity between a statute exempting a named company in its regulation of all companies issuing money orders and the statute before us, which exempts comic strips and comic sections in newspapers from its regulation of comic books.

It seems to me that the opinions in *Mabee v. White Plains Publishing Co.* (1946), 327 U. S. 178, 90 L. Ed. 607, 66 S. Ct. 511, and *Oklahoma Press Publishing Co. v. Walling* (1946), 327 U. S. 186, 90 L. Ed. 614, 66 S. Ct. 494, 166 A. L. R. 531, offer better or at least more convincing criteria as to how the United States supreme court would resolve the classification problem involved in the case at bar. The aforementioned cases concern the constitutionality of a classification which applies the *fair labor standards act* to certain seg-

ments of the press and exempts others. In the course of the opinion in the *Mabee* case, the court said:

"Respondent argues that to bring it under the Act, while the small weeklies or semi-weeklies are exempt by reason of § 13(a) (8), is to sanction a discrimination against the daily papers in violation of the principles announced in *Grosjean v. American Press Co.*, 297 U. S. 233. Volume of circulation, frequency of issue, and area of distribution are said to be an improper basis of classification. Moreover, it is said that the Act lays a direct burden on the press in violation of the First Amendment. The *Grosjean* case is not in point here. There the press was singled out for special taxation and the tax was graduated in accordance with volume of circulation. No such vice inheres in this legislation. As the press has business aspects, it has no special immunity from laws applicable to business in general. . . . [citation] And the exemption of small weeklies and semi-weeklies is not a 'deliberate and calculated device' to penalize a certain group of newspapers. . . . [citation] As we have seen, it was inserted to put those papers more on a parity with other small town enterprises. . . . [citation] The Fifth Amendment does not require full and uniform exercise of the commerce power. Congress may weigh relative needs and restrict the application of a legislative policy to less than the entire field. . . . [citation]"

It is clear to me that the legislature, in passing the statute under consideration, weighed the relative needs and restricted the application of the law to the areas which required regulation. If the Congress of the United States can validly exempt weekly and semiweekly newspapers from a statute which otherwise applies to newspapers, then I see no reason why the Washington state legislature may not exempt newspapers and their comic strips from legislation designed to regulate comic books.

The question *is not* whether we personally think comic strips in newspapers should have been included; rather, it is whether the legislature had a reasonable basis for exempting them. I fail to find any evidence of a "deliberate and calculated device" to penalize a certain segment of the publishing industry. *Mabee v. White Plains Publishing Co., supra.*

The majority opinion points out "that newspapers might print or publish anything found in any comic book without being subject to the restrictions imposed." That is not the question. We are only concerned with *whether the legislature could reasonably conclude that newspapers do not in fact publish the same things that are found in many comic books.*

In *State v. Seattle Taxicab & Transfer Co.* (1916), 90 Wash. 416, 156 Pac. 837, this court considered a statute which made it unlawful to transport passengers for hire in first-class cities without obtaining a permit; that act contained a proviso, as follows:

" 'That the provisions of this act shall not apply to carriers of U. S. Mail.' "

In holding that this proviso did not render the act void under the equal protection clause, the court said:

"Nor does the fact that carriers of the United States mails are exempted from the provision of the act render it void. These perform a service sufficiently differentiated from the ordinary carrier of passengers as to form a class of themselves, and legislation affecting other classes of carriers is not of necessity required to include them. The situation suggested in the appellant's brief, namely, that of a large corporation obtaining a contract to carry the mails and thus monopolizing the jitney traffic in a city, because not subject to the burden of the act, is hardly possible of consummation. The act is not capable of a construction which would permit the owner of a vehicle who has a contract to carry the mails to run it promiscuously over the streets of the city in the carriage of passengers when not engaged in the prosecution of his contract. As we view the act, such an owner can carry passengers without a violation of the provisions of the act only while actually transporting the mails over a route most convenient between the mail stations, otherwise he will fall within its provisions."

Similarly, in the instant case the act *does not permit newspapers to distribute comic books* without a license; and the proviso does not purport to grant such rights to newspapers.

If the majority opinion is not intended to convey the implication that the proviso grants to newspapers the privilege

of distributing comic *books* without a license, I believe its *ratio decidendi* to be even more tenuous.

It seems to me the following cases are much more analogous to the case at bar than are the authorities cited in the majority opinion.

In *State v. McFarland* (1910), 60 Wash. 98, 110 Pac. 792, the court considered a statute providing for inspection of hotels containing more than ten rooms. The statute was held valid. The decision of the court clearly recognized that the legislature, in promulgating regulatory statutes, must draw a line between what is to be included within a classification and what is to be excluded, and the court determined that the placing of all hotels of ten or more rooms within the regulated classification was reasonable and not arbitrary.

In the statute before us, the legislature has defined comic books as:

" . . . any book, magazine or pamphlet, sold or distributed for profit, *a major part of which* consists of drawings depicting or telling a story of a real or fanciful event or series of events, with a substantial number of said drawings setting forth the spoken words of the characters with pointers, or brackets, or enclosures, or by such other means as will plainly indicate the character speaking such words: . . ." (Italics mine.)

The operative words of inclusion and exclusion are contained in the phrase "a major part of which." I think the resulting legislative classification is sufficiently definite to avoid the "void for vagueness rule," and that it is manifestly as reasonable as the classification in the hotel regulation statute which was held valid in the *MacFarland* case, *supra*.

In *Austin v. Seattle* (1934), 176 Wash. 654, 30 P. (2d) 646, 93 A. L. R. 203, a city excise tax on persons and businesses lending money on chattel mortgages exempted national banking associations. The court said:

"We see nothing in the classification here attacked which smacks of arbitrary action, capriciousness or constructive fraud. The class or classes here designated may be broadly designated as those engaged in the business of making

chattel loans, and it is a matter of common knowledge, of which we take judicial notice, that those making chattel loans, are, in very many important particulars, doing a distinctively different sort of business than that which is usual and customary in commercial banking and other forms of money loaning not covered by the ordinance."

To use the language above quoted, it is a matter of common knowledge that newspapers are doing a distinctively different sort of business from that done by dealers in comic books.

Other cases could be set out and discussed to further substantiate my disagreement with the majority; however, to do so would unduly expand this opinion.

In the instances cited in the majority opinion, the legislature attempted to allow *certain* persons to do the *identical act* which was prohibited to others. That is quite a different thing from what the legislature has done in the statute under consideration—and from what the legislature did in the several cases I have discussed. In the latter cases, as in the instant case, the legislature has segregated the businesses covered into classes and has regulated or not regulated the particular classes as it found necessary.

I am unwilling to say that a newspaper is the same thing as a comic book. And I do not think it unreasonable for the legislature to come to this rather obvious conclusion and to find a different set of laws necessary to regulate the comic book business from that necessary to regulate the newspaper business.

For the reasons indicated, I do not agree with the majority view that the statute violates the equal protection clause of the fourteenth amendment. In all other respects, I do agree with the majority and concur in the result reached in this case.

HILL, C. J., OTT, and HUNTER, JJ., concur with FINLEY, J.