79 Wn.2d 69 (1971)
483 P.2d 608
THE STATE OF WASHINGTON, on the Relation of the Superior Court of Snohomish County, Respondent,
v.
SAM SPERRY et al., Appellants.
No. 41792.
The Supreme Court of Washington, En Banc.
April 8, 1971.
Davis, Wright, Todd, Riese & Jones, Charles H. Todd, and Duncan A. Bayne, for appellants.
Robert E. Schillberg, Prosecuting Attorney, David G. Metcalf and Bruce A. Keithly, Deputies, for respondent.
*70 McGOVERN, J.
"[F]ree speech and fair trials are two of the most cherished policies of our civilization, and it would be a trying task to choose between them." Justice Black, Bridges v. California, 314 U.S. 252, 260, 86 L.Ed. 192, 62 S.Ct. 190, 159 A.L.R. 1346 (1941). Because the trial court here improperly made a choice between the two rights, we reverse the convictions for contempt of court entered against the appellants.
In the fall of 1970, two young men charged with the crime of first-degree murder were about to be tried by jury in the Snohomish County Superior Court. Comprehensive press coverage of the proceeding was anticipated because of the facts surrounding the alleged murder. The Honorable Thomas G. McCrea was to preside as the trial judge. The defendants, the prosecuting attorney and the court agreed that the jury need not be sequestered during the trial.[1] As a cautionary measure, and in dedication to his responsibilities to provide the defendants a jury trial free from outside prejudicial influences, the distinguished trial judge entered an order on October 8, 1970, which provided, among other things, that:
2. No Court proceedings shall be reported upon or disseminated to the public by any form of news media, including, but not limited to newspaper, magazine, radio and television coverage, except those proceedings occurring in open Court in the presence of the Judge, jury, court reporter, defendants and counsel for all parties. No report shall be made by such news media in any event of matters or testimony ruled inadmissible or stricken by the trial judge at the time of the offer of the matter or testimony.
October 26, 1970, the jury trial commenced and appellant newspaper reporters were among the numerous news media representatives in daily attendance at the trial. October 28, 1970, the admissibility of certain evidence became *71 an issue at the trial and a hearing was held in open court and in the absence of the jury to decide its admissibility. Some of the offered testimony was deemed to be inadmissible by the court and the state was ordered not to present that part of the testimony to the jury.
October 29, 1970, the following article, prepared by the appellants, appeared in two editions of The Seattle Times, a daily newspaper of general circulation in many areas of the state, including the Snohomish County area:
The Seattle Times Thursday, October 29, 1970
 DEFENSE LOSES ROUND IN
 EVERETT SLAYING TRIAL
 By DEE NORTON
 and SAM R. SPERRY
 Times Staff Reporters
EVERETT  California authorities had probable cause for arresting Thomas E. Braun and Leonard E. Maine in a Jamestown, Calif., hotel, Snohomish County Superior Court Judge Thomas G. McCrea ruled today.
The judge announced his ruling in the absence of the jury after the morning recess. Prior to the recess, defense attorneys had attacked the consistency and credibility of testimony given by Lt. Robert Andre, a Tuolumne County sheriff's officer. Andre was called as a prosecution witness.
The judge also ruled California authorities conducted a legal search of the hotel rooms Braun and Maine were in at the time of their arrest, August 22, 1967.
Braun, 21, and Maine, 22, are accused of first-degree murder in the death of Mrs. Deanna Buse, 21, of Monroe, in August, 1967.
Andre, who was a lieutenant with the Tuolumne County Sheriff's Department in 1967, was the fourth officer called by David Metcalf, chief assistant criminal deputy prosecutor.
Andre repeated the description of the arrest given earlier by Lt. William Endicott of the California Highway Patrol and Constable Hubert Chafin of Jamestown.
Andre said the defendants were found sleeping in separate rooms at the Jamestown Hotel the morning of August 22.

*72 Andre and Endicott, using a master key, opened the doors to the rooms and found both blocked by safety chains from the inside.
Maine was ordered from his bed, directed to remove the chain and to lie face down on the hallway floor where he was handcuffed, Andre said.
The door of Braun's room was forced open and the youth taken into the hallway and handcuffed, Andre said.
Under questioning by Richard Bailey and Samuel Hale, defense attorneys, Andre said search and arrest warrants had not been obtained, although he had driven past three courts enroute to the hotel.
Hale emphasized in his questioning that Andre had time and information required to obtain warrants.
Under cross-examination by Hale, Andre outlined how the hotel had been surrounded by officers and its lobby cleared of persons who might be injured.
Numerous .22-caliber bullets were found in the clothing of each suspect when their rooms were searched, Andre said, and a handgun was found wrapped in a car blanket in a plastic carrying case in Braun's room, he said.
Andre said he advised the suspects of their rights as they lay face down on the hallway floor after their rooms had been searched.
Earlier Chafin testified he found a sedan parked near the hotel that matched the description of one believed used by two men wanted for questioning in the shooting of a girl earlier the same morning.
Mrs. Howardine Mease, of Gaviota, Calif., testified earlier yesterday that she and her family discovered the girl sprawled in the middle of a highway near Jamestown.
Stopping to assist her, Mrs. Mease said the girl told her two men had killed her companion, shot her and driven off in a 1967 green Mercury sedan.
Officer Lloyd Berry of the highway patrol then testified he was ordered to the scene and broadcast on his radio the information given him by Mrs. Mease.
Mrs. Mease also said the girl told her the assailants were named "Mike and John."
Chafin said he heard highway patrol radio broadcasts and found a green 1967 Buick otherwise fitting the description parked across the street from the hotel.

*73 Chafin said he watched the car and radioed for assistance from the Tuolumne County Sheriff's Department.
About half a dozen officers surrounded the hotel when Andre and Endicott entered the building and found "Mike Ford" and "John Ford" registered as guests, Chafin said.
After receiving and reading a copy of the newspaper account, the trial court summoned appellants before it, barred them from further attendance at the murder trial, and ordered them to show cause why they should not be held in contempt of court for violating the court's October 8, 1970 order. A written order to show cause followed. The appellants immediately petitioned this court for relief. We stayed that part of the trial court's ruling barring the appellants from the courtroom, but allowed the hearing on the alleged contempt to proceed.
Subsequently, the show cause hearing was held in open court and appellants' counsel stipulated to the basic facts leading to the alleged contemptuous publication. November 6, 1970, the trial court entered its findings, conclusions and order adjudging the appellants in contempt. This appeal followed.
We first dispose of the state's argument that the appellants are precluded from attacking the constitutionality of the October 8, 1970 order because the instant appeal constitutes a collateral attack on that order. The state claims that the order should have been attacked directly by appeal, by motion to set aside or by other immediate review. As authority for its proposition it cites Walker v. Birmingham, 388 U.S. 307, 18 L.Ed.2d 1210, 87 S.Ct. 1824 (1967). In Walker, a state court held petitioners in contempt of court for violating an injunction which had prohibited them from participating in or encouraging mass parades or processions without first obtaining a city parade permit. Because the petitioners had not directly challenged the injunction, but instead violated its terms and then appealed from a subsequent contempt of court conviction, they were not permitted to collaterally attack the constitutionality of the injunctive order.
*74 [1] The rule of Walker is inapposite here. There the order was not patently invalid, as compared to the order challenged here which is void on its face, as later in this opinion explained. We have held in a number of cases that a void order or decree, as distinguished from one that is merely erroneous, may be attacked in a collateral proceeding. State ex rel. Ewing v. Morris, 120 Wash. 146, 207 P. 18 (1922); State v. Lew, 25 Wn.2d 854, 172 P.2d 289 (1946). Also see, State ex rel. Sowers v. Olwell, 64 Wn.2d 828, 394 P.2d 681 (1964). The violation of an order patently in excess of the jurisdiction of the issuing court cannot produce a valid judgment of contempt. In re Berry, 68 Cal.2d 137, 65 Cal. Rptr. 273, 436 P.2d 273 (1968).
The "collateral bar" rule which the state contends to be enunciated in Walker has justifiably been subjected to much legal criticism, particularly as it applies to free speech cases. Frequently an injunction issues immediately before the planned activity is to occur and there is then no time available to the enjoined party to make a direct attack upon the injunction. The practical result then is that the enjoined party has no adequate remedy at law and cannot engage in a lawful activity because of an unconstitutional order. To us "It ... seems unlikely that allowing collateral attack would significantly reduce citizen compliance with lawful decrees; the citizen still faces a substantial risk of criminal penalties if proved wrong in collateral, rather than direct, attack on the decree's validity." Defiance of Unlawful Authority, 83 Harv. L. Rev. 626, 635 (1970).
Additionally, it is likely that we would have declined to review the October 8, 1970 order by direct appeal or review. The issue which we would have been asked to consider would have been purely academic. At that time there would have been no assurance that the parties and the court would at the time of commencement of trial continue to agree on a jury separation. There would have been no indication that a hearing would be held in the absence of the jury or, if held, that the court would declare any of the offered testimony inadmissible. There would have *75 been no showing that the appellants had an intention to violate the order. See Grays Harbor Paper Co. v. Grays Harbor County, 74 Wn.2d 70, 442 P.2d 967 (1968).
Appellants' principal assignment of error concerns the question of whether a newspaper may constitutionally be proscribed in advance from reporting to the public those events which occur during an open and public court proceeding. Limiting our opinion to the facts at hand, we hold that it may not.
Our decision here today is premised first on Const. art. 1, § 10, which provides:
ADMINISTRATION OF JUSTICE. Justice in all cases shall be administered openly, and without unnecessary delay.
This constitutional provision which appears in only nine state constitutions[2] mandated an open hearing in the first-degree murder trial of the two young men. In so doing, it put into immediate effect the provisions of Const. art. 1, § 5:
FREEDOM OF SPEECH. Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that right.
and the first amendment to the United States Constitution:
FREEDOM OF RELIGION, OF SPEECH, AND OF THE PRESS. Congress shall make no law ... abridging the freedom of speech, or of the press ...
In a long line of cases it has been held that an injunction which constitutes a prior restraint on speech violates the principles of the first amendment to the United States Constitution. Those principles are applicable to the states by virtue of the Fourteenth Amendment. Schneider v. Irvington, 308 U.S. 147, 84 L.Ed. 155, 60 S.Ct. 146 (1939); Murdock v. Pennsylvania, 319 U.S. 105, 87 L.Ed. 1292, 63 S.Ct. 870, 891, 146 A.L.R. 81 (1943); Adams v. Hinkle, 51 *76 Wn.2d 763, 322 P.2d 844 (1958); Fine Arts Guild, Inc. v. Seattle, 74 Wn.2d 503, 445 P.2d 602 (1968).
[2] The trial court's order of October 8, 1970 was obviously and admittedly in limitation of the appellants' liberty to write and publish an account of those things which occurred in open court. That order therefore comes to us with a presumption of constitutional invalidity. If it is to be sustained, the necessity for the limitation must be supported by a different constitutional right which requires the limitation. The state argues that such is the case, for the trial court's order rests fundamentally upon the fourteenth amendment to the United States Constitution, the due process clause. It contends that because the jury was allowed to separate, the order was necessary to prevent prejudicial matter from reaching members of the jury while they were outside the courtroom.
[3] We point out that it was not necessary to allow the jury to separate. RCW 10.49.110 provides that the court may not allow the jury to separate in a criminal case without the consent of the defendant and the prosecuting attorney. Under that statute the parties to a criminal case cannot create the right to a jury separation. By refusing to consent, the parties prohibit separation; by consenting, they permit the court to grant a separation. The ultimate decision following the consent of the parties to a jury separation still rests with the trial court. The fact that the parties here consented to a jury separation did not therefore necessitate a separation.
We also note that the trial court issued an appropriate instruction to the jury at the time it was empaneled to hear the criminal trial. It was:
The instructions I am about to give you are applicable until you have been discharged as jurors in this case. Compliance with these rules during the first phase of the trial will be difficult because of your exposure to your family and others. By consenting to your separation, the defendants and the prosecuting attorney are entrusting to you a great responsibility. The law requires that you merit the trust they have placed in you.

*77 Do not discuss this case or any criminal case or any criminal matter among yourselves or with anyone else. Do not permit anyone to discuss such subjects with you or in your presence. The violation of this order may involve a personal penalty to you and may result in a mistrial which would cause great injury to the parties in this case.
Do not read, view or listen to any report in a newspaper, radio or television on the subject of this trial or any other criminal trial. Do not permit anyone to read or comment on this trial or any criminal trial to you or in your presence.
During the course of this trial, do not read, view or listen to any report in a newspaper, radio or television on the subject of crime or sentences which result from a criminal conviction. Similarly, do not engage in any conversation with anyone with regard to such subjects and do not permit such a conversation to be carried on in your presence.
If you are asked about the case, you should advise the person making inquiry that you are under the court's instruction not to discuss it. When the trial is over you will be released from this instruction and you will then be free to discuss the case and your experience as juror.
We believe it appropriate to assume that the jury would obey that instruction. Ketchem v. Wood, 73 Wn.2d 335, 438 P.2d 596 (1968). If it did not and prejudicial matter reached and affected a member of the jury, the proper remedy would be a new trial.
[4] The judiciary cannot under circumstances like those before us, suppress, edit, or censor from the public those events which occur in open court proceedings. The principle is clear: under ordinary circumstances "A trial is a public event.... Those who see and hear what transpire[s] can report it with impunity." Craig v. Harney, 331 U.S. 367, 374, 91 L.Ed. 1546, 67 S.Ct. 1249 (1947). And "reporters of all media, including television ... are plainly free to report whatever occurs in open court through their respective media." Estes v. Texas, 381 U.S. 532, 541, 14 L.Ed.2d 543, 85 S.Ct. 1628 (1965).
*78 For the reasons stated, we conclude that the trial court's order of October 8, 1970, was void and it cannot therefore support the contempt convictions of appellants who violated the order. The trial court's earnest effort to secure and maintain a fair and impartial jury for the defendants about to be tried for a criminal offense resulted in a deprivation of the appellants' constitutional right to report to the public what happened in the open trial. If restraints upon the exercise of First Amendment rights are necessary to preserve the integrity of the judicial process, then those restraints must be narrowly drawn. The limitations imposed cannot be greater than is necessary to accomplish the desired constitutional purpose. Dorfman v. Meiszner, 430 F.2d 558 (7th Cir.1970). That is not what occurred here. To sustain this judgment of contempt would be to say that the mere possibility of prejudicial matter reaching a juror outside the courtroom is more important in the eyes of the law than is a constitutionally guaranteed freedom of expression. This we cannot say.
The judgment of contempt is vacated and held for naught.
HAMILTON, C.J., ROSELLINI, HALE, NEILL, STAFFORD, and WRIGHT, JJ., concur. ROSELLINI, J. (concurring)
I agree with the majority that the appellants have the right to challenge the validity of the order entered in the criminal case by appealing from a contempt citation issued against them. I do not think it is necessary, however, to belabor a distinction between this case and Walker v. Birmingham, 388 U.S. 307, 18 L.Ed.2d 1210, 87 S.Ct. 1824 (1967). The petitioners in that action were named as defendants in an injunction action and the injunction was served upon some, if not all, of them. They, at least, were parties to the injunction action and could have taken an appeal from the order issuing the injunction.
The appellants here were not parties to the criminal action in which the order prohibiting certain reporting of *79 the facts was entered. They had no standing to appeal from that order when it was entered. Rule on Appeal I-14, RCW vol. 0. Sheets v. Benevolent & Protective Order of Keglers, 34 Wn.2d 851, 210 P.2d 690 (1949). In that case, we said that one not a party to an action cannot appeal from a judgment, order, or decree entered therein.
For this reason, I am of the opinion that Walker v. Birmingham, supra, has no application here. There was no order from which the appellants could appeal until the contempt citation was entered. This being their first opportunity to raise the question, they certainly have the right to challenge the validity of the order upon which the contempt citation was based.
It would be an anomaly indeed if the law, while decreeing that a reporter may report with impunity falsehoods about a public official or public figure (New York Times Co. v. Sullivan, 376 U.S. 254, 11 L.Ed.2d 686, 84 S.Ct. 710 (1964); Curtis Publishing Co. v. Butts, 388 U.S. 130, 18 L.Ed.2d 1094, 87 S.Ct. 1975 (1967); Tilton v. Cowles Publishing Co., 76 Wn.2d 707, 459 P.2d 8 (1969)), decreed at the same time that he could not print the truth about judicial proceedings. A rule allowing a court to suppress publication of the facts about those matters which occur before it, even though the rule were to be used only for supposedly "legitimate" purposes and never to conceal improper acts of the court itself, would hardly be calculated to inspire in the public that respect for the judicial system which "law and order" require. The very notion of such a power in the court is utterly incompatible with the principle of equal justice, openly administered, which is fundamental to the health of a democratic society.
FINLEY, J. (concurring specially in the result)
The facts as stated in the majority opinion are quite acceptable. However, I cannot agree with certain aspects of the reasoning. I do reach the same result by a different route. I think something needs to be said about this different route, and more needs to be said about this case than has been set out in the majority opinion.
*80 The majority opinion commences with the quotation that "free speech and fair trials are two of the most cherished policies of our civilization, and it would be a trying task to choose between them." Bridges v. California, 314 U.S. 252, 86 L.Ed. 192, 62 S.Ct. 190, 159 A.L.R. 1346 (1941). The quotation is an appealing one, and by that eminent expositor of free speech Mr. Justice Black; but it seems to me the quotation is somewhat misleading and not analytically relevant in a strict sense to the problem involved and its disposition in the instant case. I can certainly agree that it would be a trying task to choose between the constitutional concepts of free press and fair trial; but recognition and statement of the difficulties inherent in such a process do not assist, and certainly do not resolve, the juristic problem involved when there is actual conflict between the two constitutional concepts. In other words, it would be nice to say that the problem is a most difficult one and leave it at that, as Justice Black's quoted statement seems to do. But we can indulge in no such philosophical luxury. We are faced with  we must evaluate and resolve  an actual conflict between the constitutional concepts of free press and fair trial posed by the prohibitory order of the trial judge and publication of the article by The Seattle Times contrary to the order.
Thus, it should be rather obvious that this is not a simple, run-of-the-mill case involving a single issue as to the interpretation of specific state or federal constitutional language  involving in isolation only one constitutional concept. Also, it is an oversimplification to say that the exercise of freedom of the press by the news media is in fact, or is in effect, absolute once a trial has begun, and events occurring in public and in open court are involved. It is, likewise, I think, oversimplification to assume that the article published by The Seattle Times could not under any circumstances prejudice the rights of the defendants to a fair trial. I have in mind particularly that portion of the article focusing upon testimony and evidence of the witness *81 Mrs. Howardine Mease[3] recounting the commission of crimes of violence in California ostensibly by the two defendants on trial in Snohomish County. Such evidence was offered and excluded by the trial judge at a hearing in the absence of the jury. The article focused upon, reported and described this inadmissible evidence.
Several questions arise. First, did the order of the trial judge prohibiting the news media from reporting the inadmissible and excluded evidence constitute censorship or a prior restraint and an improper judicial effort to restrict the constitutional right of freedom of the press? Second, did the newspaper article reporting and describing evidence ruled inadmissible and excluded in the absence of the jury constitute a "clear and present danger" to the administration of justice involving prejudice to the rights of the defendants to a fair trial? Third, did the publication of the article "have a tendency" to disrupt and frustrate the administration of justice, particularly in relation to the rights of the defendants then on trial? Lastly, was the contempt proceeding premature in the absence of reasonably convincing proof that a juror or jurors had seen, had read, and had understood the significance of, and had been influenced by, that portion of the article reporting and describing the excluded evidence of previous crimes of violence committed allegedly by the defendants in the state of California.
The fact pattern of the instant case and the above questions present rather new and unique juristic problems; as *82 there are no clear-cut, well-established controlling precedents where the legal issues are identical, and the facts are also identical, or so closely comparable, to be indistinguishable. However, considerable help, I think, may be gleaned from decisions of the United States Supreme Court in the cases of Estes v. Texas, 381 U.S. 532, 14 L.Ed.2d 543, 85 S.Ct. 1628 (1965); Sheppard v. Maxwell, 384 U.S. 333, 16 L.Ed.2d 600, 86 S.Ct. 1507 (1966); Bridges v. California, 314 U.S. 252, 86 L.Ed. 192, 62 S.Ct. 190 (1941); and Pennekamp v. Florida, 328 U.S. 331, 90 L.Ed. 1295, 66 S.Ct. 1029 (1946); and from the reasoning of Justice Traynor in People v. Lambright, 61 Cal.2d 482, 393 P.2d 409, 39 Cal. Rptr. 209 (1964). In this connection, I cannot rule out consideration of the reasoning of Justice Frankfurter, dissenting in Bridges, and concurring in Pennekamp. Even so, most careful and meticulous analysis of these cases must be made, if not as to the specific rulings and the facts in those cases, then to ascertain some guiding statements, principles, or perhaps even dicta of a particularly pertinent and persuasive character.
There has been both underreaction and overreaction in the interpretation of the decision of the court in Estes and Sheppard. This has been to the effect either (a) that there has been absolutely no change in the law as to the scope and amplitude of the right of free press or conversely (b) that the decisions have effected sweeping changes in this respect. There is no doubt whatsoever in my mind that, reduced to bare essentials. Estes and Sheppard stand for the proposition that massive news coverage, overreporting of pretrial and trial proceedings, gives rise to a legal presumption of prejudice regarding the right of criminal defendants to a fair trial by an impartial jury. Furthermore, a quick comparison with the decision of the New Jersey Supreme Court in the celebrated Hauptmann case (State v. Hauptmann, 115 N.J.L. 412, 180 A. 809 (1935), cert. denied, 296 U.S. 649, 80 L.Ed. 461, 56 S.Ct. 310 (1935), petition for writ of habeas corpus denied, 297 U.S. 693, 80 L.Ed. 985, 56 S.Ct. 385 (1936)), seems to me to demonstrate quite *83 clearly that significant change has been wrought in the law by the United States Supreme Court in the Estes and Sheppard decisions. It should be remembered in this connection that the Hauptmann case was decided more than 35 years ago. At that time the Supreme Court of New Jersey emphasized the scope and amplitude of freedom of the press, saying:
That such outbursts should occur is not unusual at the trial of a case of great public interest, and in a crowded court room....
...
Without doubt there were messengers going to and fro. Again, it was inevitable. The press and public were entitled to reports of the daily happenings, and it was quite proper for the trial judge to afford reasonable facilities for sending such reports....
...
... If the result of an important murder trial is to be nullified by newspaper stories and radio broadcasts, few convictions would stand. In State v. Overton, 85 N.J.L. 287, ... we said ...: "... While it may be that in cases of public excitement the possible effect of newspaper articles upon the jury may justify the court in its discretion in adjourning a trial and summoning another jury, it has never in this state been a ground of challenge to a juror that he had read newspaper reports relating to the case, so long as he declares his ability to consider the case on the evidence."

(Italics mine.) State v. Hauptmann, 115 N.J.L. 412, 443, 180 A. 809, 827-28 (1935).
In reading and analyzing the Sheppard case, it must be kept in mind that after determining that prejudice to the rights of the defendant was conclusively presumed, the court commented on several alternatives, controls, or remedies in regard to invasion, and prejudice, or protection of the rights of criminal defendants. Among the methods or remedies suggested as available to trial courts, the court suggested change of venue, carefully worded instructions to the jury to disregard prejudicial material not presented to them in court as evidence, and, in the final analysis, the *84 court granted a new trial to the defendants. In referring to the granting of the new trial, the court described this remedy as merely a palliative. The opinion in Sheppard, states:
If publicity during the proceedings threatens the fairness of the trial, a new trial should be ordered. But we must remember that reversals are but palliatives; the cure lies in those remedial measures that will prevent the prejudice at its inception. The courts must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences. Neither prosecutors, counsel for defense, the accused, witnesses, court staff nor enforcement officers coming under the jurisdiction of the court should be permitted to frustrate its function. Collaboration between counsel and the press as to information affecting the fairness of a criminal trial is not only subject to regulation, but is highly censurable and worthy of disciplinary measures.
(Italics mine.) Sheppard, 384 U.S., at 363. It seems to me this language of the court, reasonably construed, gives some leeway to trial judges to take appropriate measures to control and prevent prejudicial influences from affecting the deliberations and the verdict of the jury in a criminal case. The problem is how to establish and describe such preventive measures without improperly limiting freedom of speech and of the press as safeguarded by both state and United States constitutional provisions.
At this point it is appropriate to note decisions of our own court apropos of the subject of prior restraints. In Fine Arts Guild, Inc. v. Seattle, 74 Wn.2d 503, 512, 445 P.2d 602 (1968), we noted that:
We have, however, in varying contexts, applied the provisions of Const. art. 1, § 5, and the first amendment to the United States Constitution in pari materia and inferentially interchangeable. And, in so doing, we commented in Shively v. Garage Employees Local 44, 6 Wn.2d 560, 567, 108 P.2d 354 (1940), that "We are of the opinion the right of freedom of speech is not absolute."

So far as our research of the opinions of this court be concerned we have never specifically held to the contrary. And, we do not read our decision in Adams v. Hinkle, 51 *85 Wn.2d 763, 322 P.2d 844 (1958), as holding that prior restraint is prohibited by Const. art. 1, § 5, under any and all circumstances.

(Footnote omitted. Italics mine.) Additionally, it is useful to restate the comments of Professor Thomas I. Emerson of the Yale Law School which appeared in Adams v. Hinkle, 51 Wn.2d 763, 772, 322 P.2d 844 (1958):
"The concept of prior restraint, roughly speaking, deals with official restrictions imposed upon speech or other forms of expression in advance of actual publication. Prior restraint is thus distinguished from subsequent punishment, which is a penalty imposed after the communication has been made as a punishment for having made it. Again speaking generally, a system of prior restraint would prevent communication from occurring at all; a system of subsequent punishment allows the communication but imposes a penalty after the event. Of course, the deterrent effect of a later penalty may operate to prevent a communication from ever being made....
"Several features of the doctrine should be observed at the outset. In the first place, the doctrine deals with limitations of form rather than of substance. The issue is not whether the government may impose a particular restriction of substance in an area of public expression, such as forbidding obscenity in newspapers, but whether it may do so by a particular method, such as advance screening of newspaper copy. In other words, restrictions which could be validly imposed when enforced by subsequent punishment are, nevertheless, forbidden if attempted by prior restraint. The major considerations underlying the doctrine of prior restraint, therefore, are matters of administration, techniques of enforcement, methods of operation, and their effect upon the basic objectives of the First Amendment." 20 Law and Contemporary Problems 648.
(Italics mine.) Thus, according to Adams v. Hinkle, supra, a prior restraint effected by an order of the trial judge designed to meet or negate a "clear and present danger" that extra-legal factors would be prejudicial to, and violate the fair trial rights of, a criminal defendant may not necessarily be unconstitutional.
*86 It may be of some interest to digress momentarily for a brief discussion of the Washington Bench-Bar-Press Committee and its program of voluntary cooperation for commonsense accommodation of the principles of free press and fair trial. This program was launched prior to the decisions in Estes and Sheppard and has been actively pursued and developed in the state of Washington for a period of several years by dedicated members of the news media, the bar, the bench, and law enforcement agencies in the state of Washington. Several basic assumptions or convictions underlie and constitute the foundations of the bench-bar-press program. The first of these has been an abiding conviction after the advent of the decisions in Estes and Sheppard that the United States Supreme Court, in those decisions, has changed the law affecting free press and fair trial and the interrelationships of these two most significant and basic constitutional concepts. Collateral to this is the assumption that free press and fair trial can be antithetical and in direct conflict depending upon specific factual situations, in specific cases having to do, principally, perhaps, with pretrial criminal proceedings, but also, I believe, with other aspects of the judicial administration of criminal justice. The factual pattern in the instant case as it relates to The Seattle Times article reporting on the inadmissible and excluded evidence is a classic example of conflict or collision between fair trial and free press constitutional concepts.
Another basic assumption of the bench-bar-press program is that responsibility for commonsense accommodation of free press and fair trial is a joint and several responsibility of the bench, the bar, the news media, and law enforcement. In this context, another most important assumption has been that free press and fair trial cannot be regarded as absolutes; otherwise, one or the other in an absolute sense depreciates limits and is capable of negativing or destroying the other. Guidelines and Principles for the Reporting of Criminal Proceedings (carefully developed by the Bench-Bar-Press Committee, after full interchange and discussion among representatives of the bench, *87 the bar, the news media and the law enforcement agencies) provide as follows:
 STATEMENT OF PRINCIPLES
 OF THE BENCH-BAR-PRESS
 OF THE STATE OF WASHINGTON
Preamble
The Bench, Bar and Press (comprising all media of mass communications) of Washington:
(a) Recognize that freedom of news media is one of the fundamental liberties guaranteed by the First Amendment of the Constitution of the United States and that this basic freedom must be zealously preserved and responsibly exercised.
(b) Are obliged to preserve the principle of the presumption of innocence for those accused of a crime until there has been a finding of guilt in an appropriate court of justice.
(c) Believe members of an organized society have the right to acquire and impart information about their mutual interests. The right to disseminate information should be exercised with discretion when public disclosures might jeopardize the ends of justice.

(d) Have the responsibility to support the free flow of information, consistent with the principles of the Constitution and this Preamble.
To promote a better understanding between the Bench and Bar of Washington and the Washington News Media, particularly in their efforts to reconcile the constitutional guarantee of freedom of the press and the right to a fair, impartial trial, the following statement of principles, mutually drawn and submitted for voluntary compliance, is recommended to all members of these professions in Washington.
Principles
1. The News Media have the right and responsibility to print the truth. A free and responsible news media enhances the administration of justice. Members of the Bench and Bar should, within their respective canons of Legal ethics, cooperate with the news media in the reporting of the administration of justice.
2. Parties to litigation have the right to have their *88 causes tried fairly by an impartial tribunal. Defendants in criminal cases are guaranteed this right by the Constitutions of the United States and the various states.

3. No trial should be influenced by the pressure of publicity from news media nor from public clamor, and lawyers and journalists share the responsibility to prevent the creation of such pressures.
4. All news media should strive for objectivity and accuracy. The public has a right to be informed. The accused has a right to be judged in an atmosphere free from undue prejudice.
5. The news media recognizes the responsibility of the judge to preserve order in the court and to seek the ends of justice by all those means available to him.
6. Decisions about handling the news rest with editors, but in the exercise of news judgments the editor should remember that:
(a) An accused person is presumed innocent until proven guilty.
(b) Readers and listeners and viewers are potential jurors.
(c) No person's reputation should be injured needlessly.
7. The public is entitled to know how justice is being administered. However, no lawyer should exploit any medium of public information to enhance his side of a pending case. It follows that the public prosecutor should avoid taking unfair advantage of his position as an important source of news; this shall not be construed to limit his obligation to make available information to which the public is entitled.
8. Proper journalistic and legal training should include instruction in the meaning of constitutional rights to a fair trial, freedom of press, and the role of both journalist and lawyer in guarding these rights.
ADOPTED March 26, 1966, in general session, by a joint committee representing the following groups:
Washington State Supreme Court
Superior Court Judges' Association
Washington State Magistrates' Assn.
Washington State Bar Association
Washington Assn. of Sheriffs & Chiefs of Police

*89 Washington State Prosecuting Attorneys' Association
Allied Daily Newspapers of Washington
Washington Newspaper Publishers Assn.
Washington State Assn. of Broadcasters
The Associated Press
United Press-International
School of Communications University of Washington
GUIDELINES FOR THE REPORTING OF CRIMINAL PROCEEDINGS

The proper administration of justice is the responsibility of the judiciary, bar, the prosecution, law enforcement personnel, news media and the public. None should relinquish its share in that responsibility or attempt to override or regulate the judgment of the other. None should condone injustices on the ground that they are infrequent.
The greatest news interest is usually engendered during the pretrial stage of a criminal case. It is then that the maximum attention is received and the greatest impact is made upon the public mind. It is then that the greatest danger to a fair trial occurs. The bench, the bar and the news media must exercise good judgment to balance the possible release of prejudicial information with the real public interest. However, these considerations are not necessarily applicable once a jury has been empaneled in a case. It is inherent in the concept of freedom of the press that the news media be free to report what occurs in public proceedings, such as criminal trials. In the course of the trial it is the responsibility of the bench to take appropriate measures to insure that the deliberations of the jury are based upon what is presented to them in court.
These guidelines are proposed as a means of balancing the public's right to be informed with the accused's right to a fair trial before an impartial jury.
1. It is appropriate to make public the following information concerning the defendant:
(a) The defendant's name, age, residence, employment, marital status, and similar background information. There should be no restraint on biographical facts other than accuracy, good taste and judgment.
(b) The substance or text of the charge, such as *90 complaint, indictment, information or, where appropriate, the identity of the complaining party.
(c) The identity of the investigating and arresting agency and the length of the investigation.
(d) The circumstances immediately surrounding an arrest, including the time and place of arrest, resistance, pursuit, possession and use of weapons, and a description of items seized at the time of arrest.
2. The release of certain types of information by law enforcement personnel, the bench and bar and the publication thereof by news media generally tends to create dangers of prejudice without serving a significant law enforcement or public interest function. Therefore, all concerned should be aware of the dangers of prejudice in making pretrial public disclosures of the following:
(a) Opinions about a defendant's character, his guilt or innocence.
(b) Admissions, confessions or the contents of a statement or alibis attributable to a defendant.
(c) References to the results of investigative procedures, such as fingerprints, polygraph examinations, ballistic tests, or laboratory tests.
(d) Statements concerning the credibility or anticipated testimony of prospective witnesses.
(e) Opinions concerning evidence or argument in the case, whether or not it is anticipated that such evidence or argument will be used at trial.
Exceptions may be in order if information to the public is essential to the apprehension of a suspect, or where other public interests will be served.
3. Prior criminal charges and convictions are matters of public record and are available to the news media through police agencies or court clerks. Law enforcement agencies should make such information available to the news media after a legitimate inquiry. The public disclosure of this information by the news media may be highly prejudicial without any significant addition to the public's need to be informed. The publication of such information should be carefully reviewed.

4. Law enforcement and court personnel should not prevent the photographing of defendants when they are in public places outside the courtroom. They should not *91 encourage pictures or televising nor should they pose the defendant.
5. Photographs of a suspect may be released by law enforcement personnel provided a valid law enforcement function is served thereby. It is proper to disclose such information as may be necessary to enlist public assistance in apprehending fugitives from justice. Such disclosure may include photographs as well as records of prior arrests and convictions.
6. The news media are free to report what occurs in the course of the judicial proceeding itself. The bench should utilize available measures, such as cautionary instructions, sequestration of the jury and the holding of hearings on evidence after the empaneling of the jury, to insure that the jury's deliberations are based upon evidence presented to them in court.

7. It is improper for members of the bench-bar-news media or law enforcement agencies to make available to the public any statement or information for the purpose of influencing the outcome of a criminal trial.
8. Sensationalism should be avoided by all persons and agencies connected with the trial or reporting of a criminal case.
(Italics mine.)
It comes as something of a disappointment that both the trial judge and The Seattle Times seem to have given less than appropriate attention and emphasis to the spirit and intent of the Statement of Principles and the Guidelines for the Reporting of Criminal Proceedings developed so carefully and so hopefully by the Washington Bench-Bar-Press Committee. Apparently the trial judge was principally concerned with the rights of the criminal defendants then on trial, and believed that it was essentially or even solely his responsibility, and within his authority, to safeguard those rights. Perhaps also, The Seattle Times principally was concerned for the right of free press and the newspapers' responsibilities in this regard to keep the public fully informed about the criminal proceedings then in progress. Neither seem to have given much thought to the interrelationship of the two rights and possible conflict and, therefore, the need for the exercise of careful, cautious *92 judgment to allow optimal emphasis and realization as to both free press and fair trial. It seems to me that both the trial judge and the newspaper were partly right, both were partly wrong  at least potentially so.
On the one hand, the jury was carefully and properly instructed by the trial judge that they would consider and render their verdict in accordance only with the evidence presented to them in open court. The trial judge could and did give consideration to sequestration[4] of the jury. This procedure, as instanced by the decision in Sheppard v. Maxwell, 384 U.S. 333, 16 L.Ed.2d 600, 86 S.Ct. 1507 (1966), provides reasonably reliable safeguards so that only matters adduced in open court will be considered by the jury. However, this method, although hopeful in potential with respect to assuring a fair trial, is not without some serious difficulties. One of these is the extra cost involved in housing, feeding, and accommodating jurors segregated for the duration of a trial. As to this, perhaps, it can be said that the costs and budgets of government, and the courts, concerning the administration of justice should not be considered a serious bar when the desirability or necessity exists for sequestration of the jury in criminal trials of great moment and public interest. Even so, it must be realized that there are practical problems involving not only county finances and budgeting, but the availability of housing and other accommodations for sequestered jurors in particular areas of our state. In addition, there is the most sensitive and complex problem, particularly in a criminal trial which is expected to last weeks or even months, of selecting jurors who are willing to and, who without serious inconvenience, can be sequestered and separated from their families, friends, and from business and other commitments throughout a trial lasting several weeks or months. In this connection, there is, in addition, the possibility of a serious *93 objection from defense counsel in behalf of his client, the criminal defendant. Such objection takes the form of a criticism that sequestration has its difficulties and complications and has a tendency, or will actually result in, a jury that is not representative of the community in the truest sense. In other words, it may be contended that the prospect of sequestration may have a tendency, or will not result in, a freely and impartially selected jury and is, therefore, prejudicial to the rights of a defendant to full due process and a fair trial. Thus, sequestration of a jury may not be without its problems for a trial judge.
In the instant case, the trial was apparently expected to last 4 or 5 weeks. Perhaps somewhat unfortunately, in terms of effective administration of justice, a trial lasting 4 or 5 weeks currently does not seem to be unusual, nor inordinate. In any event, through careful pretrial proceedings designed to organize and direct the trial properly without unnecessary delay, the anticipated length of trial and the period of sequestration of the jury might well have been lessened and reduced by several days or even a week or so. It is hindsight, and perhaps subject to debate, but in the position of the trial judge  which I was not  the indicated doubts or problems would have been resolved in sequestration of the jury. It is safe to say as a matter of judicial notice that reasonably adequate hotel and other accommodations would have been available in Everett, Washington.
This brings me to another point. Although the trial judge, in discharging what he regarded as his responsibility, did not sequester the jury, news media people under the guidelines of the Bench-Bar-Press Committee and otherwise were not relieved of their joint and several responsibility for commonsense accommodation of problems of free press and fair trial. There was at least some serious potential danger that the inadmissible and excluded evidence would reach the jury by reason of publication of the article in The Seattle Times. It seems to me that the right of the public to be informed and to know about the trial proceedings *94 was not such a supervening, compulsive, and absolute right to justify action potentially seriously prejudicial to the rights of the criminal defendants then on trial. In numerous other instances the news media have time and again exercised most admirable journalistic or editorial judgment and restraint and have refrained from publication of material having serious potential prejudice to the rights of criminal defendants. The question has been a constantly recurring one and has to be asked, "Why did this not happen in the instant case? Was it because of the breadth and scope of the order of the trial judge, and because of his apparent assertion of authority and right, constitutional or otherwise, to restrict, restrain and limit news reporting? Was this what prompted a challenge  and the assertion by The Seattle Times of an absolute right to publish, perhaps irrespective of potential harm and prejudice to fair trial rights of the criminal defendants?" There is, perhaps, no answer except possibly that the situation just got out of hand on the part of those concerned, or who should have been more concerned. And, it is really a case of "too bad," where the hopes and expectations of the Guidelines and Principles of the Bench-Bar-Press Committee simply did not work out.
It seems beyond peradventure of doubt and debate that under our system of justice, "fair trial" means, among other things, that a criminal defendant can be convicted only on the basis of evidence properly admitted in open court and properly before the jury for its consideration and evaluation. If the proffered testimony clearly implicating defendants in murder and attempted murder in California conceivably had been admitted unqualifiedly by Judge McCrea, this would have been prejudicial to a fair trial and reversible error. If this testimony reached the jury through publication and dissemination of news by the news media, its potentially prejudicial effect upon fair trial would be no less. In fact, in either event, the potentiality of prejudice, reversible error, and the granting of a new trial for the defendants would seem to be about the same. The crucial *95 question, of course, is whether the newspaper article describing the inadmissible evidence actually reached the jury, was read, then given consideration by the jury, and whether it can be said this prejudicially affected the jury's consideration of the case.
In a somewhat comparable situation, the California Supreme Court in People v. Lambright, 61 Cal.2d 482, 487, 393 P.2d 409, 412, 39 Cal. Rptr. 209 (1964), in an opinion by Justice Traynor stated:
Since the trial court expressly authorized the jury to read newspaper accounts of the trial, it is reasonably probable that some of the jurors did so and that their misconduct, even though innocent, affected the result. Accordingly, the error was prejudicial. (People v. Watson, 46 Cal.2d 818, 836 [299 P.2d 243].)
(Footnote omitted.)
In an interesting, and, I think relevant, footnote, Justice Traynor stated:

The fact that a newspaper published an account of testimony that the trial court ruled inadmissible raises serious questions as to the propriety of such reporting. Although the protection of the First Amendment of the United States Constitution may extend in some circumstances to press coverage of judicial proceedings, such rights may be outweighed by the defendant's right to a fair trial when the latter right is in clear and present danger of obstruction by the news media. (See Pennekamp v. Florida, 328 U.S. 331, 334-336 [66 S.Ct. 1029, 90 L.Ed. 1295, 1297-1298]; Bridges v. State of California, 314 U.S. 252, 259-263 [62 S.Ct. 190, 86 L.Ed. 192, 201-203]. See generally, Due Process for Whom  Newspaper or Defendant?, Comment, 4 Stan.L.Rev. 101.) The danger was apparent in this case where the trial judge excused the jury from the courtroom to consider certain evidence and ruled that the evidence was not for the jury's consideration. As stated in People v. Stokes, 103 Cal. 193, 197 [37 P. 207, 42 Am.St.Rep. 102], "It is exceedingly unfortunate that a newspaper should publish such an article pending the trial of an important criminal case. Newspaper comments of this character are well calculated to interfere with the due and proper administration of justice. The jurors should not have read the article. The *96 newspaper should not have published it. The publication of such articles during the pendency of important trials serves no good purpose, but, on the contrary, tends to impede and adulterate the stream of justice." (See also People v. Gomez, 41 Cal.2d 150, 161 [258 P.2d 825]; People v. Powell, 171 F. Supp. 202, 205.)
(Italics mine.) Lambright, 61 Cal.2d at 487, n. 2.
Recently, in State v. Miles, 73 Wn.2d 67, 71, 436 P.2d 198 (1968), we stated:
We conclude that the testimony of the police officer, concerning an alleged plan to perpetrate a robbery like the one with the commission of which the defendants were charged, was so prejudicial in nature that its effect upon the minds of the jurors could not be expected to be erased by an instruction to disregard it. Therefore the defendants were denied a fair trial ...
The principle seems so well established in the law that there should be no question that if the excluded evidence reached and was considered by the jury, this presumptively would be prejudicial to the rights of the defendants to a fair and impartial trial. Of course, the significant question remains as to whether the excluded evidence, via the newspaper article, improperly reached, was improperly considered by, and  it can be said  improperly prejudiced the jury in the instant case. This seems to be sufficient discussion of one horn of our dilemma.
Now, as to the other focus of our dilemma, i.e., freedom of the press, the question is whether this constitutional concept  and its concomitant ramifications  has a super-sacrosanct status setting it apart and above other basic constitutional rights including fair trial rights of criminal defendants. Stating this another and perhaps extreme way, this horn of our dilemma is whether the right of free speech and freedom of the press are of such moment and scope that they may be employed in an absolute sense by the media to prejudice or destroy the right of a criminal defendant to a fair and impartial trial. I think the dilemma, or the basic question, may be the same under some circumstances, whether related either to pretrial or to trial proceedings. *97 In Bridges v. California, 314 U.S. 252, 86 L.Ed. 192, 62 S.Ct. 190 (1941), decided by a five to four divided court, Mr. Justice Frankfurter, joined by Chief Justice Stone and Justices Roberts and Byrnes in dissent, stated, at page 282:
Free speech is not so absolute or irrational a conception as to imply paralysis of the means for effective protection of all the freedoms secured by the Bill of Rights. Compare Lincoln's Message to Congress in Special Session, July 4, 1861, 7 Richardson, Messages and Papers of the Presidents, pp. 3221-3232. In the cases before us, the claims on behalf of freedom of speech and of the press encounter claims on behalf of liberties no less precious. California asserts her right to do what she has done as a means of safeguarding her system of justice.
Further comments by Justice Frankfurter at page 293 seem apropos and worth noting:
Because freedom of public expression alone assures the unfolding of truth, it is indispensable to the democratic process. But even that freedom is not an absolute and is not predetermined. By a doctrinaire overstatement of its scope and by giving it an illusory absolute appearance, there is danger of thwarting the free choice and the responsibility of exercising it which are basic to a democratic society.
In Pennekamp v. Florida, 328 U.S. 331, 90 L.Ed. 1295, 66 S.Ct. 1029 (1946), Mr. Justice Reed, writing the majority opinion for the court, stated at page 336:
Whether the threat to the impartial and orderly administration of justice must be a clear and present or a grave and immediate danger, a real and substantial threat, one which is close and direct or one which disturbs the court's sense of fairness depends upon a choice of words. Under any one of the phrases, reviewing courts are brought in cases of this type to appraise the comment on a balance between the desirability of free discussion and the necessity for fair adjudication, free from interruption of its processes.

(Italics mine.) This statement, in my judgment, aptly describes the problem on appeal in the instant case.
Concurring with the majority in Pennekamp, Mr. Justice *98 Frankfurter emphasized the fact that the provisions of many state constitutions concerning freedom of the press are coupled with provisions or specific constitutional language prescribing responsibility for the exercise of freedom of the press and for its abuse. At page 356 in Pennekamp, he stated:
Most State constitutions expressly provide for liability for abuse of the press's freedom. That there was such legal liability was so taken for granted by the framers of the First Amendment that it was not spelled out. Responsibility for its abuse was imbedded in the law.[5]
The footnote to this statement reads:
[5] The State constitutions make it clear that the freedom of speech and press they guarantee is not absolute. All, with the exception only of Massachusetts, New Hampshire, South Carolina, Vermont, and West Virginia, explicitly provide in practically identical language for the right to speak, write and publish freely, every one, however, "being responsible for the abuse of that right."
(Italics mine.) It is apt and legally relevant to note and emphasize that article 1, section 5 of the Washington Constitution provides:
FREEDOM OF SPEECH. Every person may freely speak, write and publish on all subjects, being responsible for the abuse of that right.

(Italics mine.)
Alluding to critics of the press and alleged journalistic excesses categorized as "trial by newspaper," and referring to proposed legislative restrictions on the press, Justice Frankfurter, concurring in Pennekamp, at pages 364-65, stated:
They serve also to emphasize that the purpose of the Constitution was not to erect the press into a privileged institution but to protect all persons in their right to print what they will as well as to utter it. "... the liberty of the press is no greater and no less than the liberty of every subject of the Queen," Regina v. Gray, [1900] 2 Q.B. 36, 40, and, in the United States, it is no greater than the liberty of every citizen of the Republic. *99 The right to undermine proceedings in court is not a special prerogative of the press.

The press does have the right, which is its professional function, to criticize and to advocate. The whole gamut of public affairs is the domain for fearless and critical comment, and not least the administration of justice. But the public function which belongs to the press makes it an obligation of honor to exercise this function only with the fullest sense of responsibility. Without such a lively sense of responsibility a free press may readily become a powerful instrument of injustice.

(Italics mine.) Both Bridges and Pennekamp involved contempt proceedings against newspapers for alleged attacks upon judges allegedly to influence the outcome of litigation. In support of the contempt proceedings, it was contended that the particular newspaper reports or articles constituted a "clear and present danger" or a "reasonable tendency" to interfere with and obstruct the administration of justice. In both cases, the court rejected the applicability of the suggested tests as judicial determinants of what constituted freedom of the press or abuse of it. In Bridges, 314 U.S. at 296, Justice Frankfurter commented that:
The phrase "clear and present danger" is merely a justification for curbing utterance where that is warranted by the substantive evil to be prevented. The phrase itself is an expression of tendency and not of accomplishment, and the literary difference between it and "reasonable tendency" is not of constitutional dimension.
(Italics mine.)
While the indicated tests have been useful and may be apt in some contexts, I agree with the court in Bridges and Pennekamp that the tests are speculative and conjectural  and may be too imprecise and unpredictable in weighing the values inherent in the sensitive interrelationships of free speech and press, and fair trial. In other words, a contempt proceeding based upon such tests is tenuous and speculative at best. The "clear and present danger test," any variation of it, or other language indicative of tendency, inference, or possibility constitutes a test or formula *100 too tenuous and unreal for judicial application under the circumstances in the instant case involving sensitive interrelationships or conflicts between free press and fair trial. In any event, the primary and the crucial question in the instant case was not just susceptible to, or a matter of, speculation. Rather, it could have been reduced to certainty and reality. That crucial question was simply whether a juror or jurors read, understood, and considered the article published in The Seattle Times reporting and describing the evidence excluded by the trial judge concerning alleged crimes of violence committed by the defendants in California. On this question, the jury could have been polled immediately after the publication of the article or subsequently during the trial. The polling, at least in my judgment, could have been accomplished at the time by simply inquiring about the article without revealing its contents and thereby precipitating prejudice to the due process-fair trial rights of the defendants. Actually, the question could have been asked whether the jurors had read an article concerning the trial, published in the particular issues or editions of The Seattle Times. If no juror had read the article, it seems to me that would have ended the matter as to any potential prejudice of the rights of the defendants then on trial, and a fortiori as to any actual contempt of court. On the other hand, if a juror or jurors had read the article and recalled and understood its significance, this was the time, and would have been a proper basis, for granting a new trial, and possibly for more realistic  rationally based  contempt proceedings. The record in the instant case does not indicate whether the article was or was not read by a juror or jurors. The potential evil involved is, as of now, tenuous and speculative  too much so, in my judgment, to support the contempt proceeding against the appellants, reporters of The Seattle Times.
Additionally, it should be pointed out that the contempt proceeding was predicated upon appellants' alleged violation of the trial court's October 8 pretrial order. That order purported to bar news media publication regarding evidence *101 offered or proceedings occurring in open court out of the presence of the jury. Appellants' alleged disregard of this order falls initially, or inchoately within the ambit of RCW 7.20.010, which provides in part:
The following acts or omissions, in respect to a court of justice or proceedings therein, are deemed to be contempts of court:
...
(5) Disobedience of any lawful judgment, decree, order or process of the court.
However, it is clear that the trial court's adjudication that appellants were in contempt is based upon provisions of the order of October 8, which  if literally and immediately applied and enforced, rather than retrospectively  would amount to a prior restraint and prepublication censorship. As previously noted, such prior censorship cannot be sustained under the provisions of Const. art. 1, § 5. Consequently, in this respect, the order of October 8 is unconstitutional and void. Thus, the subsequent order adjudicating appellants in contempt cannot be sustained, and I concur with the opinion of the majority that the order must be reversed and, furthermore, the contempt proceeding dismissed with prejudice.
Although the order of October 8 is constitutionally void insofar as it was applied to constitute a prior restraint and prepublication censorship, somewhat comparable orders  carefully worked out with all concerned, cautiously worded and meticulously tailored  can serve a unique and most useful purpose. That purpose is notice not only to the news media but to all concerned regarding appropriate ground rules and guidelines, such as those of the Washington Bench-Bar-Press Committee, to safeguard the administration of justice and to bring about a commonsense accommodation of both free press and fair trial constitutional rights.
We would be presented with quite a different matter had the instant contempt adjudication involved and had been based upon allegations concerning post-publication results of appellants' actions, i.e., contamination of the jury verdict *102 and post-publication accountability. In other words, although prior restraint and prepublication censorship are verboten under our state constitution  post-publication accountability, responsibility, and liability of the news media is constitutionally supportable. Actions by members of the news media amounting to potential contamination of a criminal defendant's right to a fair and impartial trial cannot be proscribed in advance. But, such actions where provably harmful to fair trial constitutional rights may subject the news media to post-publication accountability. Such accountability or responsibility is supported by the wording  and what seems to me the intent and meaning  of our state constitution. In such instances, accountability may be implemented either under the provisions of RCW 7.20.010 (9), as enacted by the legislature, which provides that any unlawful interference with the process or proceeding of a court shall constitute contempt; or, accountability can be implemented by the trial court's exercise of its inherent powers to provide protection for its proceedings.
In short, actions of the news media resulting in provable harm to a criminal defendant's right to a fair and impartial trial may subject the news media to post-publication responsibility and accountability.
It could be argued that under the above-stated principle or standard, any contamination of the jury verdict in the instant case resulting from appellants' actions presently remains open to proof, and that the proceedings in contempt should not be dismissed with prejudice. However, in light of the uniqueness of the problem and the absence of guiding precedents  clear-cut and well-established  it is my conviction that fundamental and essential principles of fair play dictate that any implementation of the principle of post-publication accountability should be reserved for prospective application in future cases. Thus, I reach the conclusion that appellants herein should not be subject to further contempt proceedings based upon allegations in regard to post-publication accountability.
As to any future cases of this nature, it seems prudent to *103 emphasize that this court should have no reservations in applying the principle or standard relative to post-publication accountability. The comments, the discussion, and guidelines indicated herein should provide notice to all concerned  and avoid any inference or contention as to surprise  that post-publication accountability dictated by our state constitution will be the applicable principle or standard in future cases of this nature. In my opinion, the indicated standard is both legally and pragmatically sound  which, incidentally, may be something of a rarity these days. It is my belief the standard indicates or provides, among other things, an appropriate and necessary solution of the sensitive and delicate problem of conflict between the constitutional concepts of free press and fair trial. Namely, the suggested solution would be based upon actual proof of tangible harm rather than upon mere suspicion, speculation, and conjecture. Such a solution avoids the problem of any prior restraint or censorship of the news media. It also avoids tenuous speculation in any application of the "clear and present danger" tests or any semantical variations thereof. Such a solution is consistent with the principles and objectives of the Washington Bench-Bar-Press Guidelines. Such a solution allows amplitude for the exercise of freedom of the press and the application of sound editorial, journalistic judgment. Concomitantly, such a solution emphasizes the sensitive and significant responsibility of the news media in the exercise of freedom of the press in relation to the constitutional concept of fair trial. While eliminating the possibility of prior restraints and censorship, such a solution is consistent with the language of our state constitution and that of other state constitutions that freedom of speech and of the press may be exercised but with those concerned "being responsible for the abuse of that right."
HUNTER and WRIGHT, JJ., concur with FINLEY, J.
Petition for rehearing denied June 4, 1971.
NOTES
[1] RCW 10.49.110 provides: "Juries in criminal cases shall not be allowed to separate, except by consent of the defendant and the prosecuting attorney, but shall be kept together, without meat or drink, unless otherwise ordered by the court, to be furnished at the expense of the county."
[2] The other eight are: Ariz. Const. art. 2, § 11 (1912); Cal. Const. art. 1, § 13 (1879); Idaho Const. art. 1, § 18 (1889); Kan. Const. Bill of Rights, § 18 (1859); Mont. Const. art. 3, § 6 (1889); Neb. Const. art. 1, § 13 (1875); Ore. Const. art. 1, § 10 (1857); S.D. Const. art. 6, § 20 (1889).
[3] The article in the October 29 issue of The Seattle Times reported:

Mrs. Howardine Mease, of Gaviota, Calif., testified earlier yesterday that she and her family discovered the girl sprawled in the middle of a highway near Jamestown.
Stopping to assist her, Mrs. Mease said the girl told her two men had killed her companion, shot her and driven off in a 1967 green Mercury sedan.
Officer Lloyd Berry of the highway patrol then testified he was ordered to the scene and broadcast on his radio the information given him by Mrs. Mease.
Mrs. Mease also said the girl told her the assailants were named "Mike and John."
The Seattle Times, Oct. 29, 1970, at C4.
[4] Under an order of sequestration, the jury would be provided room and board, and virtually kept in seclusion apart from the parties and public, and from outside or out-of-court contacts and influences for the duration of the trial proceedings.